UNITED STATES of America

v.

Terry Wayne HILTON, a/k/a
Wayne Milton, et al.

Crim. No. 78–12–ND.

United States District Court,
D. Maine, N. D.

Jan. 22, 1979.

96

George J. Mitchell, U. S. Atty., Portland, Me., for plaintiff.

Martin K. Leppo, Anthony M. Traini, Boston, Mass., for defendants.

### MEMORANDUM OF OPINION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

GIGNOUX, Chief Judge.

Sixteen defendants are charged in a one-count indictment with conspiracy to possess with intent to distribute approximately nine tons of marijuana in violation of 21 U.S.C. § 846. Presently before the Court are defendants' motions to suppress pursuant to Fed.R.Crim.P. 12(b)(3) and 41. An evidentiary hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the Court's findings of fact and conclusions of law as required by Fed. R.Crim.P. 12(e).

## I

### THE FACTS

A. *The Boarding and Search of the SOUTHERN BELLE—Arrests of Defendants Hilton, Baggett and Stover*

On May 23, 1978, the 327-foot United States Coast Guard cutter DUANE, under the command of Commander Leo N. Schowengerdt, was in the Gulf of Maine on a routine offshore law enforcement patrol. The DUANE's duties included identifying vessels, ascertaining their activities, performing documentation and safety inspections, and enforcing applicable federal law. The DUANE was on a routine patrol with no special assignment toward the interdiction of drugs. Prior to May 23 adverse weather conditions had precluded any boardings by the DUANE on its patrol. On May 23, however, the weather was clear, the visibility was excellent, and around 8:00 a. m. the DUANE began an active day. During the morning, it sighted three fishing vessels, the VITA MARIA, the SEA FLEA, and the JUDITH ANN. Boarding parties conducted documentation, safety, and fishery inspections on all three.

Shortly after 1:00 p. m., the DUANE made radar contact with another vessel, subsequently identified as the SOUTHERN BELLE. Based on the course of the vessel, as determined by radar, it was ascertained that the SOUTHERN BELLE was destined for Mount Desert Island, Maine, and for no foreign point. Schowengerdt decided to close and make visual contact with the sighted vessel. Upon arriving at the point of intercept, approximately one hour after the initial contact, the DUANE observed the name and home port on the stern of the vessel: "SOUTHERN BELLE, Wilmington, North Carolina." While cruising on a parallel course about a half mile from the SOUTHERN BELLE, Schowengerdt contacted the El Paso Intelligence Center ("EPIC"). EPIC responded that it had no information whatsoever on the SOUTHERN BELLE.[1]

1. The same inquiry had been made of EPIC with regard to the three fishing vessels which had been boarded during the morning. The result of these EPIC checks was also negative.

Schowengerdt spoke to the SOUTHERN BELLE by radio and exchanged pleasantries. He noted that there were no registration numbers on either side of the bow of the SOUTHERN BELLE.[2] Schowengerdt determined to board the SOUTHERN BELLE for a documentation and safety inspection. His decision was based on a combination of factors, including its lack of shown numbers; its geographical position in view of the recent foul weather; the abnormality of a North Carolina vessel being in Maine waters at that time of year; the appearance of the persons on deck, who were clothed in foul weather gear despite the fine day; and the ship's course toward the coast of Maine.

Schowengerdt assigned Lieutenant Paul Howard, the DUANE's senior boarding officer, and Ensign Robert Watson, the DUANE's intelligence and law enforcement officer, to conduct the inspection. The boarding party was instructed to conduct a documentation and safety inspection, but if the vessel had been boarded recently to "just turn around and come back."

The DUANE made a full circle to take up a position to the rear of the SOUTHERN BELLE for the safe launching of the boarding craft, the DUANE I, a 26-foot motor lifeboat. While doing this, the DUANE announced its intention to board by international flag hoist. When the DUANE I was in the water, the SOUTHERN BELLE contacted the DUANE by radio, asking if they were going to be boarded. Schowengerdt told them that they were. The SOUTHERN BELLE shortened sail to facilitate the boarding.

Howard and Watson took with them the customary boarding kit, which included a briefcase with various documents and checklists. In addition, Howard placed the DUANE's drug test kit in the boarding case. Although he had not been instructed by Schowengerdt to take the drug test kit, Howard felt that the kit should be taken because of the SOUTHERN BELLE's appearance as a pleasure yacht. Howard and Watson were in uniform and unarmed. The DUANE I had a three-man crew and contained two .45 caliber pistols.

The SOUTHERN BELLE was boarded at approximately 3:30 p. m. The boarding took place approximately 20 miles from the coast. Watson was the first to board. He identified himself and asked which of the three crew members—later identified as defendants Terry Wayne Hilton a/k/a Wayne Milton, William J. Baggett and Andrew N. Stover—was the master. Baggett identified himself as the master, and Watson asked Baggett for the vessel's documentation. Baggett handed Watson two folders of papers, about four or five inches thick, including various bills of sales, letters, registration papers and the like.[3] Watson, with Howard overlooking, sat down in the cockpit area and examined these papers. Baggett said the vessel had been boarded in February in Chesapeake Bay. Among the papers was a CG–4100 form which showed that a satisfactory inspection had been conducted at that time, but that the vessel was then named the HURLEVENTS and was owned by Wrightsville Sound Sailing, Inc. Baggett explained that the three of them had been hired by the owner, one Wayne Milton, to bring the vessel to Bar Harbor, and inquired how long it would take to reach Bar Harbor. Howard told him it would take five to six hours and that they should be there around 8:30 or 9:00 p. m. Baggett stated that he figured they would arrive around sunset.

After approximately ten minutes reviewing the sheaf of papers presented by Bag-

**2.** As Schowengerdt testified, a state registered vessel would show numbers on both sides of the bow. A vessel which is not state-registered should be federally documented, in which case no numbers would be shown on the outside of the vessel, but a documentation number should be inscribed on its main beam. To be validly registered, a vessel must be either state-registered or federally documented.

**3.** Howard and Watson testified that boarding officers are generally given a single document evidencing proper registration with little difficulty.

gett, Howard and Watson were unable to determine the status of the vessel. Although there was a North Carolina state registration form, it was not in the current owner's name. There were no state registration numbers on the bow, and Baggett had said that these numbers had washed off in a storm. Nor did the papers include any valid federal documentation. Howard felt that the vessel might be stolen. He had noted a number in the upper right-hand corner of various bills of sale or license and enrollment documents where the official registration number would appear on valid enrollment documents. Aware that, if the vessel was federally documented, this same official registration number should also be affixed to the vessel's main beam, the officers felt that checking for the main beam number might be a possible means of identifying the vessel as the same vessel described in the various papers presented by Baggett. Howard asked Baggett where the main beam number was located. Baggett stated that he did not know. Howard indicated that it most likely was in the engine room, and inquired where the engine room was. Baggett showed Howard to the compartment just forward and below the cockpit level, and Howard stepped through the hatch and into the engine room.[4]

While Howard was entering the engine room, Watson stooped in the cockpit at the entrance way to the living compartment while Baggett lifted a deck plate, apparently looking for the main beam number. From his crouched position, Watson looked forward and saw burlap bags in the living compartment partially covered by clothing and blankets. Watson suspected that they were bales of marijuana. He proceeded to the after part of the cockpit and radioed the captain to send an armed boarding party, since he felt unsafe in not being armed.

After about a minute and a half, Howard came out of the engine room. He had been unable to find the main beam number, but had made a safety inspection. As he was on his way to the cockpit to rejoin Watson, he too saw what appeared to be bales of marijuana in the living area. When Howard reached the deck, he and Watson conferred and decided to continue the safety inspection so as not to arouse suspicion of the crew. At this time, Howard noticed the odor of marijuana.

An armed boarding party was dispatched by the DUANE in DUANE II, the other 26-foot motor boat carried by the DUANE. Upon arrival of the armed boarding party, Howard asked the three SOUTHERN BELLE crewmen about the bales below deck. They refused to answer. Howard took a sample from one of the bales, and a field test proved positive for marijuana. He communicated the results of the test to Schowengerdt aboard the DUANE. Schowengerdt instructed Howard to arrest the three crew members and seize the vessel. Howard asked Baggett if he were in charge. Baggett said, "No," and Hilton said, "I am in charge," giving his name as "Wayne Milton." At this point, Howard arrested the three crew members, advised them of their *Miranda* rights, and seized the SOUTHERN BELLE. The arrested suspects were transported to the DUANE about 6:00 p. m.

The SOUTHERN BELLE was secured for sea and prepared for towing by a prize crew under Howard's command. It was taken in tow at approximately 7:33 p. m. Schowengerdt told Howard to search the vessel for any papers or documents that might indicate exactly where it was going.[5]

The SOUTHERN BELLE was searched by the prize crew under Howard's supervision. During the course of the search, at about 8:00 p. m., Radarman Bradley Schmitt, a member of the prize crew, discovered a locked briefcase under a metal

4. Although Howard's purpose at the time was to locate the main beam number, he testified that a normal safety inspection would have brought him to the engine room to check for oil in the bilges, wiring and other safety matters.

5. The record discloses that Schowengerdt had received instructions from the Coast Guard Atlantic Regional Office in New York to attempt to develop further information as to the SOUTHERN BELLE's destination.

hatch in the living compartment. Shortly thereafter, Schmitt discovered six rolls of film in separate containers and a camera with a partially exposed roll of film in it. Schmitt brought these items to Howard.

Schmitt and Howard attempted, without success, to open the briefcase, which was secured by a combination lock on its latch. The briefcase was then transported to the DUANE and taken to the ward room where Schowengerdt and other officers were gathered. Prior to the arrival of the briefcase, Schowengerdt had been informed of an ongoing Drug Enforcement Administration investigation of suspected drug smuggling activities at the Griswold Estate on Mount Desert Island (*see infra*). He believed that the briefcase might contain evidence of the destination of the SOUTHERN BELLE or that it might contain additional contraband or hard drugs. Under Schowengerdt's supervision, the Executive Officer then opened the briefcase. The contents included a passport, notebooks, a writing pad, a calculator, booklets, and other items.

At approximately 2:00 a. m. on May 24, the DUANE received orders from Boston to transport the three defendants to Portland, and the SOUTHERN BELLE to Boston.[6] At approximately 8:30 p. m. that evening, the DUANE met with another Coast Guard cutter, the YANKTON, outside Portland, and transferred the defendants, along with certain seized items, for delivery to Portland. The YANKTON proceeded directly to Portland, where the defendants were arraigned before a federal magistrate. The DUANE and the SOUTHERN BELLE continued to Boston, where the SOUTHERN BELLE was impounded, searched and inventoried, and the contraband and other items removed by agents of the Drug Enforcement Administration. Among the items removed were the six rolls of exposed

film and the camera which Schmitt had discovered. The film was subsequently developed and the camera returned to the owner.

B. *The Drug Enforcement Administration Investigation of the Griswold Estate*

In early May 1978 Special Agent Michael Cunniff of the Drug Enforcement Administration (DEA) received information from the New York DEA office that one Arthur DiVenuti had rented two dwellings and a garage on the Griswold Estate in the Seal Cove area of Mount Desert Island, Maine, for a three-week period beginning May 17, a period of time which was out of the normal rental season.[7] The Griswold Estate is located in a relatively isolated area on the oceanfront of Blue Hill Bay, with a 100-foot dock leading to a float which could accommodate a large oceangoing vessel. The New York office informed Cunniff that it believed contraband was to be smuggled into the property from the sea, that DiVenuti had rented the same estate for the same reason during the previous year, and that DiVenuti was connected with another person suspected of illicit drug activity. Acting on this lead, Cunniff, in cooperation with Sergeant Harry Bailey of the Maine State Police Division of Special Investigations (DSI),[8] established surveillance of the property. Twenty-four hour surveillance began about May 15. An observation point was set approximately one-half mile across the cove from the Estate at Dodge Point. Aerial reconnaissance was also employed. Some photographs were taken, both ground and aerial.

Defendants Arthur DiVenuti and his wife, Jacqueline DiVenuti, took possession of the Estate on May 17. During the following week the officers observed a gangway and two floats being installed at the

---

6. The SOUTHERN BELLE was first towed toward the east, away from Portland, the nearest port at which the DUANE could dock. Schowengerdt testified that he proceeded east in order to investigate an unusual radar sighting, which he felt might be the "mother ship" of the smuggling venture and also that he was awaiting a response to his report to the District Commander in Boston, in which he had suggested the possibility of a "controlled drop."

7. The normal rental season in the area is from Memorial Day to Labor Day.

8. The Department of Special Investigations is a composite of state and local police officers who are especially assigned to control drug trafficking in Maine.

dock and a number of persons in the dock area, one of whom appeared to be giving instructions to the others. During an aerial reconnaissance agents saw four pickup trucks with camper tops of a type known by them to be commonly used in smuggling marijuana, and four automobiles at the Estate. The officers also observed buoys that appeared to be marking a channel from the dock to the open sea.[9]

Early in the morning of May 24 Cunniff learned of the Coast Guard's boarding and seizure of the SOUTHERN BELLE and the discovery of approximately nine tons of marijuana on board the vessel. He also was informed that the owner of the vessel was Terry Wayne Hilton, the brother-in-law of Arthur DiVenuti and the brother of Jacqueline DiVenuti. He was further advised of the Coast Guard's opinion that the SOUTHERN BELLE was headed for the western shore of Mount Desert Island, where the Griswold Estate was located, and was approximately five hours from this area when seized.

During the day of May 24 DEA Special Agent John Albano observed, from Dodge Point, four individuals, one holding either a map or a chart, leave the Griswold Estate dock in a Boston whaler and proceed toward the mouth of the cove, returning about an hour and half later.

Based on the foregoing information, Cunniff had a "clear suspicion" that the persons at the Griswold Estate were involved in criminal activity in violation of the federal narcotics laws. He proceeded, with the assistance of the United States Attorney, to prepare the necessary papers to obtain a search warrant from the United States Magistrate at Portland.

C. *Stop and Inquiry of Defendants Gordon, Stark and Moore*

On May 24, 1978, Cunniff was in the process of obtaining a search warrant for the Griswold Estate. Although he was aware of the presence of a number of people at the Estate, he only knew the identities of Arthur and Jacqueline DiVenuti. Apprehensive that those on the Estate might suspect that the SOUTHERN BELLE had been seized and leave the scene, Cunniff, after consulting with the United State Attorney, requested Sergeant Bailey to have any individuals leaving the Estate stopped and identified. At approximately 10:00 p. m., Bailey instructed Troopers Parsons, White and Beldin of the Maine State Police to proceed to Route 102 near the point where that road meets the access road running to the Griswold Estate, to stop all vehicles coming onto Route 102 from the Griswold property, and to identify the occupants of those vehicles. Bailey told the troopers about the drug smuggling operation.

At approximately 11:00 p. m. Beldin stationed himself on Route 102 at a point from which he could observe vehicles leaving the Estate road. Parsons and White, in uniform and in a marked car, assumed their positions further along Route 102. At approximately 11:30 p. m. Parsons and White stopped a blue four-door Dodge sedan (Massachusetts Registration No. 866API), which Beldin had observed exiting from the Estate road. The troopers approached the automobile. No guns were drawn. The driver produced a New Hampshire license with a picture on it identifying him as defendant Paul C. Gordon. The passengers also produced licenses and were identified as defendants James S. Moore and Jeffrey T. Stark. No vehicle registration was produced, but car rental papers showed the car had been rented by defendant Linda Jo Varnum. A brief general conversation ensued,[10] and the troopers allowed the car to be on its way.

---

9. It subsequently developed that the buoys were not channel markers, but moorings similar to those which had been set out in prior years.

10. Parsons asked where the three men were headed. Gordon replied, "To a motel," while one of the passengers said they were going camping. When asked where they were coming from, Gordon answered that they were "just visiting down the road." Parsons then inquired if they had been to Cadillac (Mountain). Gordon said, "No"; Stark responded, "Yes."

D. *The Search of the Griswold Estate—Arrests of the Eight Defendants Found There*

A search warrant for the three buildings rented by Arthur DiVenuti, the tennis court, and the dock on the Griswold Estate, was issued by the United States Magistrate at Portland at 3:50 a. m. on May 25. This warrant was executed about 6:30 a. m. on the same day by a team of 10–15 federal and state law enforcement officers. Defendants Arthur DiVenuti, Jacqueline Di-Venuti, Robert Eremian, Aimee Garvey, Linda Jo Varnum, Daniel Eremian, Richard Valliere and Leland Scott Cole were found in the main house. All of the occupants were told, as they were encountered, that they were not under arrest and that the purpose of the officers was to search the Estate pursuant to a court order.

Cunniff and Albano led the approach to the main house. After banging on the door and receiving no answer, they entered the house into the living room through the unlocked door. Various of the defendants were sleeping in the living room on couches and on chairs. Cunniff asked that they arise. Cunniff found Arthur and Jacqueline DiVenuti in the first bedroom that he entered. He identified himself, told them they were not under arrest, and that he had a search warrant for the residence, which he read to Arthur DiVenuti. He escorted the DiVenutis to the living room. In the corridor, Cunniff asked Arthur DiVenuti if he knew Terry Hilton. Arthur answered, "Yes, he's my brother-in-law." Asked if Hilton was expected, Arthur said that "he could walk in any minute" and that he was arriving by car. Upon reaching the living room, Cunniff asked Jacqueline DiVenuti if she knew Terry Hilton. She said that he was her brother. When Cunniff told her that Hilton had been arrested with marijuana on a boat believed to be headed for the Estate, she refused to answer any more questions.

Albano discovered Aimee Garvey and Robert Eremian in the bedroom areas and took them into the living room. Albano then conducted personal history interviews with Leland Cole, Aimee Garvey, Robert Eremian, Arthur DiVenuti and Jacqueline DiVenuti. At the start of each interview, Albano identified himself, related that he was executing a search warrant, informed each individual that he or she was not under arrest, and read to each the *Miranda* warnings, making sure that each acknowledged and understood his or her rights. None of the defendants requested the opportunity to call a lawyer.[11] Each interview took approximately 10–15 minutes. The interviews were completed at about 8:00 a. m. The information, other than personal histories, obtained from the interviews was as follows:

Cole said that he was on vacation, having been invited to the Griswold Estate by his lifelong friend, Arthur DiVenuti. He stated that the Mercury Capri (Massachusetts Registration No. 279–59N) in front of the residence was his. He went on the Boston whaler with Richard Valliere and the DiVenutis on May 24. He said he was unaware of the expected arrival of any boat carrying marijuana.

Garvey stated that she had been at the Estate for two days, that she knew nothing about a sailboat carrying marijuana, and that the Chrysler Cordoba (Massachusetts Registration No. 281–09N) on the premises was her rental.

Robert Eremian stated that he had been at the Estate for two days on a tennis vacation, and that the Mercury Monarch (Massachusetts Registration No. 592–099) at the Estate was his.

Arthur DiVenuti stated that he and his wife owned the BMW (Massachusetts Registration No. 343–AHF) and the Chevrolet pickup truck (Massachusetts Registration No. BB 1413A) at the Es-

---

11. Although Aimee Garvey testified that nearly all of the defendants apprehended at the Estate asked to call a lawyer and were denied the opportunity to do so, the Court rejects this testimony. The Court also rejects Garvey's testimony that she was not given the *Miranda* warnings until after her arrest.

tate. He said that they had rented the Estate for a vacation, that he had taken a boat trip the previous day to view neighboring islands, and that he knew nothing about an expected arrival of a sailing vessel with marijuana.

Jacqueline DiVenuti refused to answer any questions other than those pertaining to her personal history.

The search of the house uncovered large amounts of cash, at least four nautical charts, sophisticated radio communication equipment, and several spiral notebooks. In addition, three hand carts were found. These had been extended with wooden planks to permit the carrying of large objects.

Approximately $3800 was found in Aimee Garvey's pocketbook, which the agents had requested that she bring into the living room. She stated that it was her life savings, and that she did not believe in banks. Another $300 was discovered in Linda Jo Varnum's pocketbook. A briefcase claimed by Robert Eremian, which was on the living room table, was found to contain $4000. Eremian said the money was to be used to buy a good second-hand truck for his business. Also in the briefcase the agents found keys to the Mercury Monarch, manuals for a two-way marine radio and a 40-channel citizen's band radio, and a United States passport issued to Robert Eremian with a number of entries, including one to Colombia, South America, only two weeks earlier.

A 40-channel citizen's band radio was found in Aimee Garvey's bedroom. Upon questioning by Cunniff, after Albano had advised her of her *Miranda* rights, Garvey said that the radio was hers and that she liked to talk on CB radios. Two other 40-channel citizen's band radios were found: one in Garvey's bedroom closet, and another in the DiVenutis' bedroom. Also discovered in the DiVenutis' bedroom were two walkie-talkie radios.

A spiral notebook inside Linda Jo Varnum's pocketbook contained net and gross weight notations, along with shorthand markings to the effect that the numbers on the bales should include net and gross

weights. Another spiral notebook found on the living room table contained names and telephone numbers of local motels. It also showed the name "Steve" and the name "Jeff." A piece of blue paper noting sales of bales of marijuana was inside Arthur DiVenuti's wallet. Arthur disclaimed any knowledge of this piece of paper.

Finally, a key to Room 209 in the Holiday Inn in Ellsworth, Maine, was found in Linda Jo Varnum's pocketbook.

All items seized from the residence at the Griswold Estate were inventoried and secured.

After the search of the residence was underway, Cunniff turned his attention to the six vehicles found at the Estate. He asked the DiVenutis if he could search the BMW and the Chevrolet pickup truck owned by them, informing them that he could not search without their consent and that anything found could be seized and used in court. They consented, and the vehicles were searched.

After receiving similar warnings from Cunniff, Leland Cole consented to the search of the Mercury Capri belonging to him, and his vehicle was searched.

Robert Eremian refused to consent to a search of the Mercury Monarch rented by him. His vehicle was impounded. Cunniff observed a loading coil and antenna on the outside of Eremian's car, and a marine radio, microphone, and citizen's band radio inside the automobile. He also saw several packages of fish decals on the front seat.

Robert Frost was not present at the Estate. Arthur DiVenuti told Cunniff that Frost had been there, but had gone out the night before and had not yet returned. The Ford pickup truck registered to Frost (Massachusetts Registration No. B/B 2650A) was impounded.

Cunniff told Aimee Garvey that he would like to search the Chrysler Cordoba rented by her, but that she need not consent. She refused to consent. Approximately one-half hour later, following the searches of the DiVenutis' vehicles, Cunniff again asked Garvey if she had given any more thought to consenting. She again refused.

She then conferred with Arthur DiVenuti, who said, "Let him search the car." After that, she reapproached Cunniff and said that she would let him search the car. Cunniff asked if she was sure, and she said, "Yes." He asked her to open the car. She retrieved the keys from the house and opened both the car and its trunk. Inside the trunk was a cardboard box that was taped shut, along with a number of large plastic garbage bags. Garvey indicated that the box contained a scale which she used to weigh parcels in her clothing business. She gave Cunniff permission to open the box. The scale and garbage bags were seized. Also seized were various items which were in plain view in the trunk and in the interior of the car, including a roll of opaque frosting paper, a CB radio, an antenna, and an Avis rental contract.

The eight defendants found at the Griswold Estate were placed under formal arrest at approximately 9:00 a. m. About 10:30 a. m. they were transported to the United States Courthouse at Bangor. Search warrants for the Mercury Monarch rented by Robert Eremian and the pickup truck registered to Robert Frost were obtained on May 30, and the vehicles were searched the following day.

### E. *Other Searches and Seizures*

1. *Arrests of Defendants Frost and Schroeder.* After the eight defendants apprehended at the estate were taken to Bangor, the phone at the Griswold Estate rang at approximately 11:00 a. m. DSI Agent James Isgro answered the phone. The person at the other end of the line identified himself as "Steve" and asked for "Artie." Isgro turned the phone over to Cunniff, who identified himself only as "Mickey." The voice on the other end then asked for "Bobby." Cunniff replied that they were all out in the whaler. "Steve" left a message for them to call back in the afternoon. Cunniff asked if he was "still in 209," referring to the motel room key found in Linda Jo Varnum's pocketbook. The response was "Yes."

Following the foregoing conversation, Cunniff and DSI Agent Michael Vittum went to the Holiday Inn in Ellsworth. Upon their arrival, Vittum spotted a familiar truck, a pickup truck with a camper cap (Massachusetts Registration No. 275–AIH), which Vittum knew was registered to Robert Eremian.[12] A man walked to the back of this truck, opened it and removed a canvas bag. The officers approached this man, identified themselves, and inquired as to his identity. The man identified himself as Robert Frost, stated that he did not own the truck and that he was merely taking some beer from the vehicle. He became agitated and demanded to know if he was under arrest. Cunniff then arrested him for conspiracy to violate the federal narcotics laws, and seized the truck.[13]

After Frost's arrest, Cunniff and Vittum entered the Holiday Inn and learned that Room 209 was registered to Linda Varnum.

Cunniff and Vittum also observed another pickup truck, with a camper cap outfitted similarly to Robert Eremian's, in the Holiday Inn parking lot. A telephone call disclosed that this truck, Massachusetts Registration No. AC8 257, was registered to Terry Wayne Hilton. Shortly thereafter, Cunniff saw a man drive the Hilton truck

---

**12.** This pickup truck, driven by Robert Eremian, had been stopped for speeding on May 22 by Maine State Police Trooper Terrence Parsons on Route 3 in Ellsworth, approximately 25 miles from the Griswold Estate. Vittum had been called to the scene. The camper cap windows were covered with opaque material. Eremian granted the officers permission to look in the back of the truck. They observed that the rear had been gutted, apparently to enable the truck to carrying a substantial load. The May 22 stop was in no way connected with the surveillance of the Griswold Estate.

**13.** Cunniff testified that his arrest of Frost was based on his knowledge that Frost had been at the Griswold Estate, that a pickup truck registered to Frost had been found at the Estate, and that Frost had ready access to the truck owned by Robert Eremian, who was one of the suspects apprehended at the Estate. Additionally, Cunniff observed that this Eremian truck had fish decals identical to those seen in Eremian's car at the Estate.

from the motel parking lot to a nearby shopping mall, where he left the truck momentarily. The officers approached the truck as the man was getting back into it. After identifying himself, Cunniff questioned the driver, who stated that his name was Dean Schroeder and that the truck was borrowed from a friend, Terry Wayne Hilton. Cunniff asked permission to look into the camper, informing Schroeder that he could refuse. Schroeder unlocked and opened the camper cap door. The camper was found to contain some clothes and groceries, along with two suitcases. A short time later, Cunniff arrested Schroeder for conspiracy to violate the federal narcotics laws, and seized the vehicle. Schroeder refused to answer any further questions.

The seized Eremian and Hilton trucks were towed to the Orono State Police Barracks, where they were impounded and subsequently inventoried. Frost and Schroeder were transported in police cars to the Federal Building in Bangor.[14]

2. *Arrest of Defendant Moore.* At approximately 1:00 p. m. on May 25, Isgro, having completed his part in the search at the Griswold Estate, was driving home in an unmarked police car on Route 1A from Ellsworth to Bangor. He saw a brown pickup truck with a camper cap, Massachusetts Registration No. AC 15231, traveling in the same direction in front of him. Isgro followed the truck, noting that it was traveling at a slower than normal speed, that the cap windows were covered by opaque material, that it had fish decals similar to those he had seen at the Griswold Estate, and that the driver continuously checked the rear view mirror as if aware that he was being followed. Isgro became suspicious and called for a marked police car to stop the vehicle. The truck was stopped on Route 1A. Isgro approached the driver,

identified himself as a police officer, and asked for a license and registration. The Massachusetts license produced showed the driver to be James S. Moore; the vehicle registration was in the name of one Frank Roberts. In response to Isgro's questions, Moore stated that he was on a fishing vacation, was alone, and had borrowed the truck from Roberts, who was a friend. He allowed Isgro to look into the back of the camper. Isgro found only an ice cooler. In the cab of the truck Isgro observed a fishing tackle box and a new fishing pole, without a reel. Moore was wearing a fishing hat with a temporary license and some fishing flies attached to it. After this conversation, lasting approximately 10–15 minutes, Moore was permitted to drive away.

Isgro proceeded into Bangor where he met DSI Agent George Robinson in a restaurant parking lot. Robinson told Isgro that he had followed a pickup truck driving suspiciously through several back streets in Bangor. The description of the truck matched that of the one Isgro had just stopped on Route 1A. Almost simultaneously, Moore, in the Roberts pickup truck, drove into the parking lot where the officers were talking, and Moore got out of the truck and made a phone call from a public telephone in the lot. At this point, Isgro left the lot and telephoned Sergeant Bailey, telling him of the above information concerning Moore. Bailey informed Isgro that Moore was one of the individuals who had been stopped leaving the Griswold Estate the previous night. He told Isgro to detain Moore until either he or Cunniff arrived.[15] Isgro returned to the restaurant parking lot. Moore's truck had left, but Isgro caught up with him on Route I–95 south of Bangor, where Isgro stopped the truck and detained Moore awaiting Cunniff's arrival.

---

14. While in the police car with Sergeant Bailey, Schroeder made several incriminating statements about his involvement in the conspiracy. Since at this point Schroeder had not been given the *Miranda* warnings, the Government has conceded that his statements cannot be used against him in its case in chief. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 (1966). *But see Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

15. Cunniff had given general instructions that persons felt to be connected with the smuggling venture should be detained until Cunniff arrived to question them.

Cunniff arrived at the I–95 stop scene about 15–20 minutes after Isgro had effected the stop. Isgro related to Cunniff the information he had concerning Moore. Cunniff examined Moore's license and the Roberts' registration, and with Moore's permission searched the truck. He then arrested Moore for conspiracy to violate the federal narcotics laws, and seized the vehicle.[16] Moore and Cunniff entered the back seat of a police cruiser, which transported them to the Federal Building in Bangor.[17] The truck was driven to the Orono impound area.

Upon arrival at the Federal Building, Moore was taken to the detention area, where the other defendants arrested at the Estate and near the Ellsworth Holiday Inn were locked up. As Moore passed the cell in which Robert Eremian was confined, Eremian spoke to him, saying, "Don't worry, Steve, we have got someone coming." Moore turned around and began talking to Eremian. Realizing that Moore might be the person who had telephoned the Estate that morning and identified himself as "Steve," Cunniff said, "Hey, Steve." Moore turned around toward him.

3. *Arrests of Defendants Stark and Gordon.* Defendants Jeffrey T. Stark and Paul C. Gordon surrendered after the return of the indictment.

## II

## THE LAW

Defendants seek to suppress all the evidence obtained directly or indirectly from the foregoing searches and seizures. With respect to the warrantless searches and seizures, suppression is sought on the ground that they were not justified by exigent circumstances or any other recognized exception to the Fourth Amendment warrant requirement. With regard to the searches and seizures pursuant to search warrants, suppression is sought on the grounds that the supporting affidavits failed to set forth sufficient probable cause for their issuance and that the seizures were beyond the scope of the warrant. In addition, defendants contend that the statements and admissions made by various defendants are inadmissible under the doctrine of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■■■■ At the outset, the Court reiterates the fundamental tenets of the law of search and seizure. First, warrantless searches and seizures are impermissible unless justified by either exigent circumstances or other recognized exceptions to the warrant requirement. *E. g., Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). The burden rests on the Government to prove that such circumstances existed or such exceptions were applicable when it attempts to validate a warrantless search or seizure. *Id.* Second, when a search is based on a warrant, the supporting affidavits presented to the magistrate "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 114–

---

**16.** Cunniff testified that his arrest of Moore was based on his knowledge that Moore had been stopped the previous night leaving the Griswold Estate in a similar type truck; that the windows of the truck Moore was driving were covered with the same opaque material seized from Aimee Garvey's car at the Estate; that Moore's truck had fish decals similar to those seen in Robert Eremian's rented car at the Estate; and that Moore's fish story was "fishy," since he apparently had no reel or line with him.

**17.** While riding in the police car, Moore had a conversation with Cunniff without having first been advised of his *Miranda* rights. The Government concedes that any statements Moore made after his arrest while being transported to the Federal Building in Bangor are inadmissible under *Miranda v. Arizona, supra,* and that they will not be offered against Moore in the Government's case in chief. *But see Harris v. New York, supra.*

15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Unlike warrantless searches and seizures, there is a presumption that those conducted on the authority of a warrant are valid. *United States v. Ventresca, supra,* 380 U.S. at 106, 85 S.Ct. 741.

A. *The Boarding and Search of the SOUTHERN BELLE—Arrests of Defendants Hilton, Baggett and Stover*

■ Only the three defendants on board the SOUTHERN BELLE—Hilton, Baggett and Stover—have standing to raise Fourth Amendment objections to the searches of and seizures from the vessel. *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). None of the remaining defendants has established a reasonable expectation of privacy in the premises searched or the property seized. *Id.* They were not present on the premises, nor has any of them ever claimed a proprietary or possessory interest in the premises or the items taken. They, therefore, do not have actual standing to object. *Id.* Similarly, the concept of "automatic standing" as originally expounded in *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), even if it remains viable after *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (*see Rakas v. Illinois, supra,* —— U.S. at —— n. 4, 99 S.Ct. 421; *Brown v. United States, supra,* 411 U.S. at 228, 93 S.Ct. 1565), does not help these defendants. They have not been charged with a crime that includes as an essential element possession of the seized evidence at the time of the contested searches and seizures. *Brown v. United States, supra* at 229, 93 S.Ct. 1565. The one-count indictment only charges the defendants with conspiracy to distribute marijuana in violation of 21 U.S.C. § 846. The Government need not prove that any of the defendants possessed marijuana in order to convict them of conspiracy under 21 U.S.C. § 846. *United States v. Riquelmy,* 572 F.2d 947, 951 (2d Cir. 1978); *United States v. Prueitt,* 540 F.2d 995, 1004 (9th Cir. 1976), *cert. denied sub nom. Temple v. United States,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977); *see Brown v. United States, supra; United States v. Galante,* 547 F.2d 733, 736–38 (2d Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Boston,* 510 F.2d 35, 37–38 (9th Cir. 1974), *cert. denied,* 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975). The remaining defendants, therefore, lack automatic standing to challenge the searches and seizures from the SOUTHERN BELLE.

Defendants Hilton, Baggett and Stover challenge the boarding and search of the SOUTHERN BELLE as violative of their Fourth Amendment rights on a variety of grounds. They argue that the statute under which the Coast Guard acted, 14 U.S.C. § 89(a), is unconstitutional; that the warrantless boarding and subsequent search of the vessel were constitutionally impermissible because of the absence of probable cause or exigent circumstances; that the boarding and search infringed their constitutional rights because the boarding of the vessel was a "subterfuge," the Coast Guard acting as a "stalking horse" for the DEA; and that even if the search of the vessel was valid, the opening, without warrant, of the locked briefcase, camera and film containers was constitutionally proscribed. The Court rejects defendants' arguments as untenable.

■ The Coast Guard boarding of the SOUTHERN BELLE was pursuant to the authority of 14 U.S.C. § 89(a), which authorizes the Coast Guard to

make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, in-

spect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, it if shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

There is no question that this law is constitutional. *United States v. Miller*, 589 F.2d 1117, 1125 n. 3 (1st Cir. 1978); *United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc); *United States v. One 43 Foot Sailing Vessel*, 538 F.2d 694 (5th Cir. 1976) (per curiam); *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976); *cf. United States v. Freeman*, 579 F.2d 942, 946 (5th Cir. 1978) (upholding constitutionality of analogous customs statute, 19 U.S.C. § 1581(a)). Pursuant to its authority, the Coast Guard may stop and board any American flag vessel on the high seas. *Id.* The boarding need not be founded on any particularized suspicion. *Id.* The cases have also recognized that the Coast Guard, having boarded a vessel, is empowered to conduct documentation and safety inspections, and if, during the course of such inspections, circumstances arise that generate probable cause to believe that a violation of federal law has occurred, the Coast Guard may conduct searches, seize evidence, and

make arrests. *Id.; United States v. Hillstrom*, 533 F.2d 209 (5th Cir. 1976) (per curiam), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977).

■ The boarding and subsequent search of the SOUTHERN BELLE, and the arrests of the three defendants found on board the vessel, were fully justified under the foregoing principles. As the Court has expressly found, the Coast Guard officers boarded the vessel, pursuant to the authority of Section 89(a), to conduct a documentation and safety inspection.[18] In the course of their routine checks, while attempting to ascertain the proper documentation and rightful owner of the SOUTHERN BELLE, both Howard and Watson inadvertently discovered partially covered bales of marijuana in the living quarters. Since the officers were lawfully aboard the vessel and permissibly in the places where they observed the marijuana bales, the discovery of the bales was justified under the "plain view" exception to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (per curiam); *United States v. Hillstrom, supra.* The discovery of the bales and the positive marijuana test gave the officers abundant probable cause to believe that the SOUTHERN BELLE and, her three crewmen were involved in criminal activity in violation of the federal narcotics laws. The subsequent arrests of the three defendants and seizure and search of the vessel, therefore, were supported by ample probable cause. *United States v. Warren, supra; United States v. Odom, supra; see Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *United States v. Watson*, 423 U.S. 411, 423, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).[19]

**18.** The Court rejects defendants' contention that the boarding was a subterfuge, that the Coast Guard officers were acting as stalking horses for the DEA. There is simply no evidence to support this charge.

**19.** Although not necessary to the Court's holding, the warrantless search of the SOUTHERN

BELLE may also have been permissible under the federal forfeiture statutes. Pursuant to 21 U.S.C. § 881, a vehicle or a vessel may be seized without a warrant where there is probable cause to believe that it has been used or is intended for use in transporting or facilitating the transportation of controlled substances. There is substantial authority to support the

There remains for comment only defendants' contention that the warrantless opening and searches of the locked briefcase, camera and film containers found on board the SOUTHERN BELLE infringed their Fourth Amendment rights. Defendants rely on *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), where the Supreme Court held that the warrantless opening and search of a locked footlocker, which had been removed from the trunk of an automobile and transferred to the Federal Building, was impermissible. No defendant, however, has established a proprietary or possessory interest in these items, nor has any defendant established a reasonable expectation of privacy in them. None of the defendants, therefore, has standing to raise Fourth Amendment objections to the opening and searches of these items. *Rakas v. Illinois, supra; Brown v. United States, supra.*[20] Moreover, Commander Schowengerdt's testimony, which the Court accepts, shows that the contents of the briefcase were sought in an effort to obtain information leading to the land co-conspirators in the smuggling venture. Prior to the opening of the briefcase aboard the DUANE, Schowengerdt had been advised of the DEA's surveillance of the Griswold Estate at Mount Desert Island, where the SOUTHERN BELLE's course indicated that she might be proceeding. There was concern that if alerted to the seizure of the SOUTHERN BELLE, those at the Estate might escape. "Time was of the essence

and it was 'not practicable to secure a warrant.'" *United States v. Robinson*, 174 U.S.App.D.C. 351, 356, 533 F.2d 578, 583 (en banc), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976) (quoting *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925). These exigent circumstances, along with the abundant probable cause that already existed, would alone justify the warrantless search of the briefcase. *Id.*

Defendants' motions to suppress the evidence seized from the SOUTHERN BELLE are denied.

### B. The May 24 Stop of Defendants Moore, Stark and Gordon

Defendants Moore, Stark and Gordon contend that the investigatory stop of their car by Troopers Parsons and White, as they were leaving the Griswold Estate on the night of May 24, violated their Fourth Amendment rights, and that evidence derived therefrom, including the identification of the occupants, should be suppressed. They argue that there was no "founded suspicion" on which an investigatory stop could be lawfully made. The Court disagrees.

The law governing the constitutional validity of the brief investigatory stop in question is undisputed. In *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–81, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court made clear that the stop of a moving vehicle involves a "seizure" within

---

proposition that a vehicle so seized may be subsequently searched without a warrant. *United States v. Johnson*, 572 F.2d 227, 232–34 (9th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978); *United States v. Panebianco*, 543 F.2d 447, 456 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977); *United States v. La Vecchia*, 513 F.2d 1210, 1215–16 (2d Cir. 1975); *United States v. Shye*, 473 F.2d 1061, 1065–66 (6th Cir. 1973); *United States v. Edge*, 444 F.2d 1372, 1375 (7th Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 101, 30 L.Ed.2d 97 (1971). *See also United States v. One 1972 Chevrolet Nova*, 560 F.2d 464, 469 (1st Cir. 1977). While these cases all involved searches of seized automobiles, the analogy to searches of seized vessels is persuasive. *See United States v. Miller, supra* at 1125 and n. 3.

**20.** Given the absence of standing to object to the warrantless opening of the locked briefcase, film containers and camera, an analysis of whether the rule of *United States v. Chadwick, supra*, applies to these searches is unnecessary. *Compare United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977) *and United States v. Gaultney*, 581 F.2d 1137 (5th Cir. 1978) *with United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978) *and United States v. Schleis*, 582 F.2d 1166 (8th Cir. 1978). The Supreme Court has granted certiorari in a case where a warrantless search of a suitcase taken from the trunk of an automobile was upheld. *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 247, 58 L.Ed.2d 236 (1978).

the meaning of the Fourth Amendment, even if the period of detention is short. *See Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because of the limited nature of the intrusion, however, the Court held that such stops may be justified without a showing of probable cause. *United States v. Brignoni-Ponce, supra*, 422 U.S. at 880, 95 S.Ct. 2574; *see Terry v. Ohio, supra*, 392 U.S. at 22, 88 S.Ct. 1868. "The principle established by *Brignoni-Ponce*, on analogy to the 'stop and frisk' decision in *Terry* . . is that a vehicle may be stopped for questioning of the occupants when an officer has specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants." *United States v. Montgomery*, 182 U.S.App.D.C. 426, 430, 561 F.2d 875, 879 (1977) (citations omitted). Given specific and articulable facts, the investigating officer may question the driver and passengers about their identities and even ask that they explain suspicious circumstances. *United States v. Brignoni-Ponce, supra*, 422 U.S. at 881–82, 95 S.Ct. 2574; *Adams v. Williams, supra*, 407 U.S. at 145–46, 92 S.Ct. 1921. It is the collective information of all the officers involved in a particular investigation that is to be considered in assessing the propriety of the stop. *Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Clark*, 559 F.2d 420, 424–25 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *White v. United States*, 448 F.2d 250, 254 (8th Cir. 1971), *cert. denied*, 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972). Here, the stopping officers, Troopers Parsons and White, were entitled to rely on the information known to Agent Cunniff and Sergeant Bailey. *Whiteley v. Warden, supra*, 401 U.S. at 568, 91 S.Ct. 1031.

 Applying the foregoing principles, it is beyond question that the stopping officers had specific and articulable facts justifying the brief investigatory stop. By the night of May 24, numerous facts were known to law enforcement officials which indicated that the Griswold Estate was the base for a drug smuggling operation. The Estate had been recently rented and was being occupied during the off season by a lessee who had been connected to drug smuggling by a tip from the New York DEA office. The property was located in a secluded area and had a deep-water dock capable of receiving a large oceangoing vessel. A number of pickup trucks with camper caps, a type known by the officers to be frequently used in drug smuggling activities, had been observed on the Estate. There had been a recent flurry of activity at the Estate, at the dock, and on the water. The land law enforcement officers had been informed of the Coast Guard's seizure of the SOUTHERN BELLE on the previous day. They also knew that the vessel, with approximately nine tons of marijuana, was believed to have been headed toward the Mount Desert Island coast, the location of the Griswold Estate. The owner of the SOUTHERN BELLE, Terry Wayne Hilton, was known to be the brother and brother-in-law of the DiVenutis, the lessee-occupants of the Estate. The vehicle occupied by defendants Moore, Stark and Gordon was stopped after exiting the access road leading from the Estate.[21]

These specific and articulable facts gave the stopping officers more than sufficient grounds to stop and question the occupants of the car. The investigative stop was clearly lawful under the standards expounded above, and all evidence derived therefrom is admissible.

The motion of defendants Moore, Stark and Gordon to suppress any evidence, including their identification, derived from the stop of their vehicle on the night of May 24, is denied.

## C. The Searches and Arrests at the Griswold Estate

The eight defendants who were arrested on the morning of May 25 at the Griswold

---

**21.** As noted above in the Court's findings of fact, the dwellings on the Estate not rented by the DiVenutis were uninhabited at this time.

Estate—Arthur and Jacqueline DiVenuti, Linda Jo Varnum, Leland Cole, Robert Eremian, Daniel Eremian, Richard Valliere, and Aimee Garvey—seek to suppress all evidence seized pursuant to the search warrant on the ground that the supporting affidavits presented to the Magistrate were insufficient to demonstrate probable cause. In addition, defendants contend that the Fourth Amendment rights of the respective owners were violated by the searches of Robert Eremian's briefcase, Linda Jo Varnum's and Aimee Garvey's pocketbooks, Arthur DiVenuti's wallet, and the six vehicles parked at the Estate. Defendants also assert that the statements and admissions made by various defendants to the agents are inadmissible under the doctrine of *Miranda v. Arizona, supra.* The Court finds no merit in any of these contentions.[22]

### 1. The Search of the Estate—Arrests of the Eight Defendants

 The May 25 search of the Griswold Estate was pursuant to a search warrant issued by the United States Magistrate upon the basis of affidavits submitted by DEA Agent Steadman and the Coast Guard officers involved in the seizure of the SOUTHERN BELLE. It is clear that abundant probable cause to search was demonstrated to the Magistrate in the affidavits. The affidavits related in detail the facts, recited above, which were known to the officers as a result of their prior investigation and surveillance of the Estate, their knowledge of the boarding and search of the SOUTHERN BELLE, and the circumstances leading them to conclude that the SOUTHERN BELLE, with its cargo of marijuana, had been proceeding toward an unloading site on Mount Desert Island. As is well established, a probable cause determination must "weigh not individual layers but the 'laminated' total." *United States v. Clark, supra* at 424. The specific facts recited in the supporting affidavits clearly furnished a substantial basis for the Magistrate to conclude that instrumentalities and evidence of a conspiracy to possess with intent to distribute marijuana would be found at the Estate. *See Aguilar v. Texas, supra,* 378 U.S. at 111, 84 S.Ct. 1509; *United States v. Ventresca, supra,* 380 U.S. at 106, 85 S.Ct. 741.[23] Similarly, the arrests of the eight defendants found at the Estate, based on the facts recited in the warrant affidavits and the evidence of criminal activity discovered during the search, plainly were supported by ample probable cause. No arrest warrants were required. *Gerstein v. Pugh, supra,* 420 U.S. at 113, 95 S.Ct. 854; *United States v. Watson, supra,* 423 U.S. at 423, 96 S.Ct. 820.

### 2. The Searches of the Briefcase, Pocketbooks, and Wallet

 Defendants contend that the searches of Robert Eremian's briefcase, Lin-

---

**22.** Under the standards recently set forth in *Rakas v. Illinois, supra; see Brown v. United States, supra,* only the eight defendants present at the Estate have standing to attack the validity of the warrant issued to search the Estate; only the individual owners of the briefcase, pocketbooks and wallet have standing to object to the searches of these items; and only the owners or lessees of the vehicles have standing to raise objections to the searches of their respective vehicles. Similarly, the only defendants who have standing to contest the admissibility of statements under *Miranda* are those who spoke them. Fifth Amendment rights are personal and may not be vicariously asserted. *Couch v. United States,* 409 U.S. 322, 328–29, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); *In re Michaelson,* 511 F.2d 882, 889 (9th Cir.), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975); *see Fisher v. United States,* 425

U.S. 391, 396–98, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

**23.** Defendants strain to perceive in Steadman's affidavit misleading statements with respect to prior activity observed at the Griswold Estate dock, which they argue entitle them to an evidentiary hearing as to the truthfulness of the statements under *Franks v. Delaware, supra.* In order to be entitled to an evidentiary hearing under *Franks,* a defendant must make a substantial preliminary showing that the warrant affidavit contains a false statement necessary to the finding of probable cause and that the false statement was made either knowingly and intentionally, or with reckless disregard of the truth. *Id.,* 438 U.S. at 155, 98 S.Ct. 2674. The allegedly misleading statements in Steadman's affidavit fall far short of meeting any part of this standard.

da Jo Varnum's and Aimee Garvey's pocketbooks, and Arthur DiVenuti's wallet were outside the scope of the warrant. The warrant authorized the seizure of, among other items, "telephone notebooks, tally sheets and other documents." As a general proposition, where there are reasonable grounds for believing that items sought and described in a premises search warrant may be concealed in personal belongings found on the premises, a search of these belongings is within the scope of the warrant. *United States v. Johnson,* 154 U.S.App.D.C. 393, 475 F.2d 977 (1973). These defendants argue, however, that the searches of their personal belongings were barred under the principles announced by the Court of Appeals for the First Circuit in *United States v. Micheli,* 487 F.2d 429 (1st Cir. 1973). In *Micheli,* the Court held that the extent to which a personal effect falls outside the scope of a search warrant depends upon "the relationship between the person and the place." *Id.* at 431. Applying this standard, the court reasoned that searches of the personal effects of visitors to premises must be appraised by reference to "the reasonable expectations of privacy which visitors bring to premises." *Id.* at 432. An occupant of a residence which is being searched has no such reasonable expectation of privacy in his belongings found there; a "mere visitor or passerby who suddenly [finds] his belongings vulnerable to a search of the premises" has such a privacy interest therein. *Id.*

In the present case, Arthur DiVenuti, the owner of the wallet, was the lessee of the Estate. Robert Eremian, Linda Jo Varnum and Aimee Garvey had each spent at least one night, if not more, at the Estate and were clearly not mere passerbys. "[I]t could reasonably be expected that some of [their] personal belongings would be there." *Id.* In short, even applying the *Micheli* standard, the searches of these personal belongings were properly carried out within the scope of the warrant.

### 3. *The Vehicle Searches*

Defendants contend that the searches of the six vehicles found at the

Griswold Estate violated their Fourth Amendment rights. The searches of the DiVenutis' BMW and the pickup truck owned by them, the Mercury Capri belonging to Leland Cole, and the Chrysler Cordoba rented by Aimee Garvey, were valid consent searches under the principles delineated by the Supreme Court in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Prior to the vehicle searches, all defendants had been advised of their *Miranda* rights. In addition, Cunniff asked each of these defendants if he could search the vehicle. He explicitly informed the defendants that they were under no obligation to consent, and that if they did consent, anything found could be seized and used in court. *See id.* at 227, 93 S.Ct. 2041. Although Aimee Garvey testified that she was not sure she could have refused permission to search her vehicle and did so only under the threat that it would be towed away, knowledge of the right to refuse consent is not "the *sine qua non* of an effective consent." *Id.* at 227–34, 249, 93 S.Ct. at 2051. *See also United States v. Horton,* 488 F.2d 374, 380–81 (5th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *Robbins v. MacKenzie,* 364 F.2d 45, 50 (1st Cir.), *cert. denied,* 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966) ("[b]owing to events, even if one is not happy about them, is not the same thing as being coerced."). The evidence clearly shows that Aimee Garvey's consent to the search of her vehicle, including the box and contents in the trunk, was voluntarily given, and not the result of duress or coercion. *See Schneckloth v. Bustamonte, supra,* 412 U.S. at 220, 93 S.Ct. 2041; *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir. 1977). Nothing about her age, intelligence, education or demeanor at the time remotely suggests to the contrary. *See Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. 2041; *United States v. Watson, supra,* 423 U.S. at 424–25, 96 S.Ct. 820.

The other two vehicles parked at the Estate—the Mercury Monarch rented by Robert Eremian and the pickup truck

registered to Robert Frost—were searched pursuant to search warrants issued by the United States Magistrate on May 30, upon the basis of affidavits submitted by DEA Agent Steadman. In addition to the information contained in Steadman's May 25 affidavit in support of the application for the warrant to search the Griswold Estate, Steadman's May 30 affidavit informed the Magistrate that the two vehicles had been found parked at the Estate at the time of the search, that eight defendants had been arrested there, and that a variety of incriminating evidence had been seized at the Estate. Steadman's affidavit also informed the Magistrate of the subsequent arrests of defendants Frost and Schroeder and the seizure of the two pickup trucks later during the day of May 25 at the Holiday Inn in Ellsworth. There can be no question that the two vehicle search warrants were supported by an ample showing of probable cause in the supporting affidavits. *See Aguilar v. Texas, supra,* 378 U.S. at 111, 84 S.Ct. 1509; *United States v. Ventresca, supra,* 380 U.S. at 106, 85 S.Ct. 741.

### 4. *Defendants' Statements*

Defendants seek to bar from evidence, on *Miranda* principles, all statements and admissions made by defendants during the May 25 search of the Griswold Estate. They particularly urge exclusion of certain inculpatory statements made by Arthur and Jacqueline DiVenuti while DEA Agent Cunniff was escorting them from their bedroom to the living room (that Terry Wayne Hilton was Arthur's brother-in-law and Jacqueline's brother) and statements made by Aimee Garvey to Cunniff when Cunniff found a CB radio in her bedroom (that the radio belonged to her).

▄▄▄ The statements made by the DiVenutis admitting their relationship to defendant Hilton were made before they had been given *Miranda* warnings. The DiVenutis had, however, been informed by Cunniff that they were not under arrest. Cun-

niff had done no more than ask them to go to the living room with the others while the premises were being searched. It is clear that at the time they made these admissions, the DiVenutis had not been "taken into custody or otherwise deprived of [their] freedom of action in any significant way," *Miranda v. Arizona, supra,* 384 U.S. at 444, 467, 86 S.Ct. at 1612; *see Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Therefore, no *Miranda* warnings were required, and these defendants' statements to Cunniff are admissible. *Id. See also Fisher v. Scafati,* 439 F.2d 307 (1st Cir.), *cert. denied,* 403 U.S. 939, 91 S.Ct. 2256, 29 L.Ed.2d 719 (1971); *Freije v. United States,* 408 F.2d 100 (1st Cir.), *cert. denied,* 396 U.S. 859, 90 S.Ct. 129, 24 L.Ed.2d 111 (1969).

▄▄▄ The record discloses that any other statements made by defendants, including the statements made by them during the personal history interviews conducted by DEA Agent Albano and the statements made by Aimee Garvey to Cunniff concerning the CB radio in her bedroom, were made after the defendants had been informed by Albano or Cunniff of their *Miranda* rights and each had acknowledged his or her understanding of those rights. There is ample evidence that the defendants' waivers of their rights were knowingly and intelligently made. Their statements are, therefore, admissible in evidence. *Schneckloth v. Bustamonte, supra.*[24]

\* \* \* \* \* \*

Defendants' motions to suppress the evidence seized at the Griswold Estate, including the statements and admissions made by defendants at the Estate, are denied.

### D. *Other Searches and Seizures*

#### 1. *Arrests of Defendants Frost and Schroeder*

Counsel for defendants Robert Frost and Dean Schroeder has conceded the legality of

---

**24.** Although Aimee Garvey testified that she was not given the *Miranda* warnings until after her arrest, the Court has accepted the contrary

testimony of Cunniff and Albano. See note 11, *supra.*

the stops and arrests of these defendants at the Ellsworth Holiday Inn and of the seizures and searches of the two pickup trucks found there.[25] In addition, counsel for these defendants has conceded the admissibility of all statements made by them to law enforcement officers prior to their arrests.

The motions of defendants Frost and Schroeder to suppress the evidence seized at the Holiday Inn in Ellsworth, including any statements made by them prior to their arrests, are denied.[26]

### 2. *Arrest of Defendant Moore*

Defendant Moore contends that the two investigatory stops and subsequent search of the pickup truck he was driving on the afternoon of May 25 violated his Fourth Amendment rights, and that all evidence obtained as a result thereof, including any statements made by him, should be suppressed.[27] He argues that there was no "founded suspicion" on which these investigatory stops could be lawfully made and that the officers lacked probable cause to search his vehicle. There is no merit in defendant's contentions.

■■■ As noted above (see Part II, B, *supra* at 108–109), a law enforcement officer may stop a vehicle for questioning of the occupants when the officer has specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants. *United States v. Brignoni-Ponce, supra,* 422 U.S. at 884, 95 S.Ct. 2574; *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. 1921;

*Terry v. Ohio, supra,* 392 U.S. at 22, 88 S.Ct. 1868; *United States v. Montgomery, supra,* 182 U.S.App.D.C. at 430, 561 F.2d at 879. Clearly, DSI Agent Isgro had specific and articulable facts to justify both his initial stop of Moore's truck on Route 1A and the subsequent stop of the vehicle on Route I-95.

When Isgro first encountered Moore traveling north on Route 1A from Ellsworth in a pickup truck with a camper cap bearing Massachusetts license plates, he observed that the truck was similar to others found at the Griswold Estate; that the cap windows were covered with opaque material similar to that found at the Estate; and that a fish decal similar to those observed on vehicles at the Estate was prominently displayed. These observations, coupled with the facts that the vehicle was proceeding at a slower than normal speed and that the driver continuously checked the rear view mirror as if aware that he was being followed, gave Isgro more than sufficient grounds to stop and question the occupant. *See United States v. Clark,* 501 F.2d 492, 494 (9th Cir. 1974). No search of the truck was made during this first stop. Isgro merely took notice of items in plain view. *See Coolidge v. New Hampshire, supra,* 403 U.S. at 474, 91 S.Ct. 2022. The statements made by Moore in response to Isgro's routine questioning are admissible. No *Miranda* warnings were required because at no time during this first detention was Moore in custody. *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. 1602; *see Oregon v. Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. 711.

---

**25.** No other defendant has objected to the searches of these two vehicles. The only other defendants who might have standing to object are Robert Eremian, to whom the Frost truck was registered, and Terry Wayne Hilton, to whom the Schroeder truck was registered. *See Rakas v. Illinois, supra*; *Brown v. United States, supra.* In any event, the officers had ample probable cause for the seizure and search of the vehicles, and to the extent that evidence was obtained therefrom subsequent to the impoundment of the vehicles at the Orono State Police Barracks, the searches were valid inventory searches under *South Dakota v. Op-*

*perman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

**26.** The Government has conceded that the incriminating statements made by Schroeder while in the police car with Sergeant Bailey after his arrest cannot be used in its case in chief, because Schroeder had not been given the *Miranda* warnings. See note 15 *supra.*

**27.** Only Moore has standing to challenge the two stops and search of this vehicle. *Rakas v. Illinois, supra*; *Brown v. United States, supra.*

In addition to the observations that occasioned the Route 1A stop of Moore's truck, Isgro had obtained additional information prior to the Route I–95 stop. He had been informed by DSI Agent Robinson that the Moore vehicle had been observed driving suspiciously through the back streets of Bangor. He had learned from Sergeant Bailey that Moore had been identified the night before leaving the Griswold Estate. He also knew of the arrests of the eight suspects and the evidence of a criminal conspiracy discovered during the search of the Estate earlier that day. Clearly, the second stop and the brief detention of Moore until Cunniff could arrive to question him were permissible. *See Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. 1921.

When Cunniff arrived at the scene of the I–95 stop, all of the factors noted above gave him probable cause to arrest Moore for conspiracy to violate the federal narcotics laws. *See United States v. Clark, supra,* 559 F.2d at 424. No arrest warrant was required. *Gerstein v. Pugh, supra,* 420 U.S. at 113, 95 S.Ct. 854; *United States v. Watson, supra,* 423 U.S. at 423, 96 S.Ct. 820. Cunniff also had probable cause to search the truck. The search of the truck, therefore, was valid under the automobile exception to the warrant requirement. *Chambers v. Maroney,* 399 U.S. 42, 53, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In addition, Cunniff's search of the truck was a valid consent search. *Schneckloth v. Bustamonte, supra.* Moore consented to the search after being warned by Cunniff that he had a right to refuse. *Id.,* 412 U.S. at 227, 93 S.Ct. 2041. Moore himself opened the camper cap door. *Id.* at 220, 93 S.Ct. 2041; *United States v. McCaleb, supra* at 721.[28]

The Government has conceded that statements made by Moore after his arrest, while he was being transported to the Federal Building in Bangor, cannot be used in its case in chief against him, because Moore had not been given the *Miranda* warnings. See note 17, *supra.* After his arrival in Bangor Moore made no statements in response to police interrogation. Defendant seeks to suppress, however, any testimony concerning his conduct in turning around when Cunniff said, "Hey, Steve." But Moore's reflex reaction to Cunniff's remark was not the result of police interrogation. *See Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. 1602. Nor did his instinctive reaction in turning around constitute a "communication" or "testimony." *See Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). No *Miranda* warnings were therefore required. *Id.*

Defendant Moore's motion to suppress the evidence seized at the I–95 stop of the vehicle he was driving, including any statements made by him prior to his arrest and any testimony concerning his reaction to Cunniff's remark at the Bangor Federal Building, is denied.

### III

The motions of defendants Schroeder and Moore to suppress the use of their post-arrest statements in the Government's case in chief against them are granted. In all other respects, defendants' motions for suppression of evidence are denied.

IT IS SO ORDERED.

---

**28.** The law is clear that any person in lawful possession of a vehicle may permit an examination of it. *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir. 1974) (per curiam); *United States v. Mallory,* 460 F.2d 243, 247 (10th Cir.), *cert. denied,* 409 U.S. 870, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *United States v. Eldridge,* 302 F.2d 463, 465–66 (4th Cir. 1962). Even when one is given a vehicle for only a short time, the law recognizes the possessor's authority to permit a search. *E. g., United States v. Eldridge, supra.*