UNITED STATES of America, Appellee,

v.

Terry Wayne HILTON a/k/a Wayne Milton, William J. Baggett and Andrew N. Stover, Defendants, Appellants.

No. 79–1209.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1980.

Decided April 11, 1980.

Anthony M. Traini, Boston, Mass., with whom Martin K. Leppo, Boston, Mass., was on brief, for defendants, appellants.

Margaret D. McGaughey, Asst. U. S. Atty., Portland, Me., with whom James W. Brannigan, Jr., U. S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Defendants appeal their convictions in the district court on one count of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846. The principal issue raised on this appeal is the

constitutionality of the boarding and subsequent search of the sailing vessel *Southern Belle* on the high seas by officers of the United States Coast Guard. Defendants challenge the introduction at their trial of evidence seized during this search and of evidence removed from a locked briefcase and film containers found aboard; they also claim that without such material there was insufficient evidence to sustain their convictions.

*The Facts*

The circumstances of the boarding and search of the *Southern Belle* are detailed in full in the opinion of the district court on defendants' motion to suppress, 469 F.Supp. 94 (D.Me.1979). For present purposes, we need only state the following. On May 23, 1978, a clear, calm day, the 327-foot Coast Guard cutter *Duane* was cruising on regular patrol in the Gulf of Maine. At about 1:00 p. m., having boarded three fishing vessels earlier in the day for routine inspections, the *Duane* made radar contact with a fourth vessel later identified as the *Southern Belle*. This contact occurred on the high seas, approximately 20 miles from the coast of the United States. While the *Duane* moved closer for a visual sighting, the crew plotted that the *Southern Belle* was proceeding on a steady course of 20° north, indicating an expected landfall in the vicinity of Mt. Desert Island, Maine.

About one hour after initial radar contact, the *Duane* sighted the vessel, the stern of which bore the inscription: "*Southern Belle*, Wilmington, North Carolina." After further observation, the commander of the *Duane* decided to send a boarding party to conduct a safety and documentation inspection of the *Southern Belle*. At the suppression hearing, Cmdr. Leo N. Schowengerdt testified that the factors he considered in making this decision included: the absence of state registration numbers on the bow of the vessel, its geographical position, the distance of the ship from its home port at that time of year, the appearance of the persons on deck who were wearing foul whether gear on a clear day, and the ship's course toward the coast of Maine.

A five-man boarding party consisting of two officers and a three-man crew were dispatched in a motor launch to board the *Southern Belle*. The boarding took place at about 3:30 p. m. approximately 20 miles from the coast. The three men on board the *Southern Belle*—later identified as defendants Terry Wayne Hilton, William J. Baggett and Andrew N. Stover—assisted the boarding party by shortening sail and taking on lines from the launch. Upon inquiry, Baggett identified himself as the ship's master and produced a large packet of documents purporting to be the ship's registration papers. Lieutenant Paul Howard and Ensign Robert Watson were unable to determine from these papers whether the vessel was properly registered. Baggett explained that the three men aboard had been hired by one Wayne Milton, the vessel's owner, to sail the vessel to Bar Harbor, Maine, and inquired how long it would take the vessel to reach Bar Harbor.

Howard and Watson could find neither a valid, current state registration (which would also have required the vessel to show an identification number on the bow) or a valid federal registration. Suspecting that the vessel might be stolen, they decided to check the vessel's main beam number to see if the number engraved on the beam corresponded to the official registration number on the documents Baggett had presented. Lieutenant Howard asked where the engine room was, whereupon Baggett escorted him through a hatch below the cockpit area and forward into the engine room. Ensign Watson remained in the cockpit area looking through the hatch toward the living compartment in the direction Howard had gone. From this position Watson observed burlap bags partially covered by clothing and blankets which he suspected were bales of marijuana. Watson then radioed the *Duane* requesting an armed boarding party as reinforcements.

While in the engine room, Howard was unable to find the main beam number, but he did conduct a brief safety inspection. On the way back to the cockpit, Howard also observed the burlap bags in the living

compartment. Once on deck, Howard noticed the odor of marijuana. When the armed boarding party arrived, Howard asked the three *Southern Belle* crewmen about the bales, but they refused to answer. A field test of a sample from one of the bales registered positive for marijuana. Eventually, 234 bales weighing 6¼ tons were found aboard. Cmdr. Schowengerdt then ordered Howard by radio to arrest the three men and seize the vessel. At this point, Baggett disclaimed his earlier contention that he was master of the vessel; Hilton, who gave his name as Wayne Milton, then stated "I am in charge." The arrested suspects were transported to the *Duane* about 6:00 p. m.

At approximately 7:30 p. m., the *Southern Belle* was taken in tow by the *Duane* with a prize crew aboard under Lieutenant Howard's command. At the direction of the Coast Guard Atlantic Regional Office in New York, Howard then conducted a full search of the vessel for documents or papers that might reflect the vessel's course at the time of the seizure. This search turned up a locked briefcase, which was found under a metal hatch in the living compartment, and a 35 mm camera with six rolls of film in separate canisters. Taken aboard the *Duane*, the briefcase was opened by the ship's executive officer under Cmdr. Schowengerdt's supervision. Schowengerdt testified he had been informed by this time that the Drug Enforcement Agency (DEA) was conducting an investigation of suspected drug smuggling activities on Mt. Desert Island, Maine, where a large shipment of marijuana was imminently expected. He stated that he ordered the briefcase to be opened because he believed it might contain additional contraband or evidence tying the *Southern Belle* to the Mt. Desert Island activities. The briefcase in fact contained a passport, notebooks, a writing pad, a calculator, booklets, and other items. The six rolls of exposed film were later developed and together with items from the briefcase admitted into evidence.

The land-based DEA investigation led to the arrests of 13 other persons at various points near the Maine coast. All 16 were charged with conspiracy to possess marijuana with intent to distribute. Subsequent to the district court's ruling on the motion to suppress, the 13 land-based conspirators pleaded guilty. Defendants Hilton, Baggett and Stover were tried by a jury and found guilty. After trial, defendants filed motions in the district court seeking reconsideration of the denial of their motion to suppress and a judgment of acquittal notwithstanding the verdict. On April 26, 1979, these motions were denied, and defendants were sentenced. This appeal followed.

## I.

The Coast Guard boarding of the *Southern Belle* was conducted pursuant to the authority of 14 U.S.C. § 89(a), which provides:

"The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to

render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized."

Under this statute, the Coast Guard may stop and board any American flag vessel on the high seas [1] without a warrant and without any particularized suspicion of wrongdoing. Although the statutory language is quite broad, the statute has been consistently construed as limiting such stops—in the absence of probable cause—to the necessary task of conducting safety and document inspections. *See, e. g., United States v. Warren*, 578 F.2d 1058, 1064–65 (5th Cir. 1978) (en banc); *id.* at 1077 (Roney, J., dissenting); *United States v. Hillstrom*, 533 F.2d 209, 210 (5th Cir. 1976) (per curiam), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Odom*, 526 F.2d 339, 342 (5th Cir. 1976); *cf. United States v. Zurosky*, 614 F.2d 779, 787–789 (1st Cir. 1979) (construing similar customs search statute, 19 U.S.C. § 1581); *United States v. Freeman*, 579 F.2d 942 (5th Cir. 1978) (same). A more extensive search is permissible only if there is consent or probable cause to believe a crime has been or is being committed. *Id.* Upon probable cause, the Coast Guard is authorized to seize the vessel and its contents, and to arrest those aboard. 14 U.S.C. § 89(a); *see United States v. Warren, supra*, 578 F.2d at 1065.

We have previously stated that the statute, as so construed, is undoubtedly constitutional. *United States v. Miller*, 589 F.2d 1117, 1125 n. 3 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (dictum). The Fifth Circuit has also taken this position, *see United States v. One (1) 43 Foot Sailing Vessel*, 538 F.2d 694, 694 (5th Cir. 1976) (per curiam). The Ninth Circuit has upheld the stopping of a vessel for safety and document inspection at least where a safety hazard was observed. *United States v. Odneal*, 565 F.2d 598, 601 (9th

Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978). *Cf. United States v. Piner*, 608 F.2d 358 (9th Cir. 1979) (limiting nighttime safety inspections).

We believe the limited intrusion represented by a document and safety inspection on the high seas, even in the absence of a warrant or suspicion of wrongdoing, is reasonable under the fourth amendment. While not devoid of protection under the fourth amendment, the ordinary vessel, like an automobile, carries with it a lesser expectation of privacy than a home or office. *United States v. Zurosky*, 614 F.2d 779, 790 (1st Cir. 1979); *United States v. Miller*, 589 F.2d 1117, 1125 (1st Cir. 1978). *But see* Note, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea*, 93 Harv.L. Rev. 725, 728 (1980). And even more than cars, vessels are inherently mobile. The oceans are the highways of the world. Vessels off our coasts may be from anywhere on any mission. They may easily lose themselves on the trackless waters. The government's interests in being able to identify craft off the coasts are of major importance; to secure those interests the government must have a limited right to detain and inspect. The government's interests in being able to conduct discretionary safety inspections of its flag vessels have a similar degree of importance. The Coast Guard is vested with broad authority to promote the safety of American vessels on the high seas, 14 U.S.C. § 2. Under international law, the United States is expected to regulate the safety and lawful operation of its flag vessels on the high seas. *See* Convention of the High Seas, Sept. 30, 1962, arts. 5, 10, 13 U.S.T. 2312, 2315, 2316, T.I.A.S. No. 5200; *United States v. Warren*, 578 F.2d 1058, 1064 n. 4 (5th Cir. 1978); *United States v. One (1) 43 Foot Sailing Vessel*, 405 F.Supp. 879, 882 (S.D.Fla.1975), *aff'd*, 538 F.2d 694 (5th Cir. 1976) (per curiam). Improperly

---

1. The high seas lie seaward of the territorial waters, which extend three miles from the coast. The high seas encompass the contiguous zone (also known as the customs waters) extending three to twelve miles from the coast.

We deal here with the boarding of an American vessel by the Coast Guard beyond the 12-mile customs limit. *See United States v. Warren*, 578 F.2d 1058, 1064 n. 4 (5th Cir. 1978) (en banc); *compare* 19 U.S.C. § 1581(a).

registered or unsafe American vessels may constitute an international hazard. Inspection schemes limited to inspecting vessels in American ports would decrease the Coast Guard's ability to police all American flag vessels, particularly since such vessels may operate far from the shores of the United States, seldom calling on American ports.

We observe that in the analogous area of customs searches within 12 miles of the coast, broad authority to stop and board without probable cause or a warrant historically bears the imprint of approval. The authority presently embodied in 19 U.S.C. § 1581 can be traced to the First Congress. Act of August 4, 1790, c. 35, § 31, 1 Stat. 145, 164; *see United States v. Freeman,* 579 F.2d 942, 946–47 (5th Cir. 1978); *cf. United States v. Ramsey,* 431 U.S. 606, 616–17, 97 S.Ct. 1972, 1978–79, 52 L.Ed.2d 617 (1977); *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886).

■ Because of the unique circumstances existing on the high seas, the long history of regulatory stops and inspections of ocean-going vessels, the heavy overlay of maritime and international law, the concern of the nation for policing its ocean borders, even beyond the 12-mile customs zone, and the strong interest in regulating the conduct of vessels protected by our flag, we believe the Coast Guard's practice of stopping American vessels on the high seas for safety and document inspections, with or without suspicion of wrongdoing, constitutes an exception to the usual rule that warrantless searches are per se unreasonable. *Compare, e. g., Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564 (1971); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). This exception is comparable to others explicitly recognized by the Supreme Court, and is based on a unique confluence of the policies behind such traditionally distinct exceptions as the border search doctrine, the administrative inspection of highly regulated industries exception, and the automobile exception. *See United States v. Whitmire,* 595 F.2d 1303, 1315 n. 36 (5th Cir. 1979), *petition*

*for cert. filed,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283. The exception does not authorize Coast Guard officers to explore a vessel beyond the search reasonably incident to a safety and document inspection, and it assuredly does not give carte blanche to search private books, papers, or other effects or areas of a vessel not related to the purposes of such an inspection.

Defendants argue that random, warrantless Coast Guard stops cannot be justified under the administrative inspection exception in light of *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). In *Barlow's,* the Court held that inspections of businesses subject to the Occupational Safety and Health Act could not be conducted without an administrative warrant, although such a warrant could be issued without probable cause in the traditional sense. The short answer to defendant's contention is that the constitutionality of the Coast Guard's boarding practices does not stand or fall on meeting the requirements of the administrative inspection exception. What would be reasonable in procedures for searches of domestic commercial establishments would not necessarily be reasonable in procedures for Coast Guard boardings on the high seas. *See Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1395–1396, 59 L.Ed.2d 660 (1979) (reasonableness standard governs). Indeed, even were we to apply the *Barlow's* standard to Coast Guard boardings, the traditionally pervasive regulation of ocean-going traffic, both commercial and recreational, makes this case more analogous to the exception recognized for industries "long subject to close supervision and inspection." *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970) (liquor); *see also United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms).

Defendants contend that the authority to board and inspect pursuant to section 89(a) runs afoul of the holding in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), that random warrantless stops of automobiles to check licenses

and registration are impermissible. Defendants urge that the same "[s]tandardless and unconstrained discretion" that troubled the Court in *Prouse* operates in the case of random Coast Guard boardings as well. Again, we disagree. Justice Blackmun, concurring in *Prouse*, highlighted the limits of the holding in that case:

> "I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different."

440 U.S. at 664, 99 S.Ct. at 1401. Not only is the context of automobile stops significantly different from that of boardings on the high seas, but the limited alternatives available to the government in pursuing its objectives of safety, identification and proper registration of vessels flying our flag are substantially less attractive. There can be no possibility of setting up roadblocks in the North Atlantic as a less intrusive alternative. *Id.* While the Coast Guard is thus left with considerable discretion in deciding which vessels to stop, we believe such discretion is virtually unavoidable in a scheme of regulation that depends on stops conducted at sea, far from courts and magistrates.

## II.

We therefore conclude that the commander of the Coast Guard cutter *Duane* was not barred by the Constitution from stopping and boarding the *Southern Belle*, whether or not he had reasonable suspicion or probable cause to believe a violation existed. Once officers Howard and Watson were aboard the vessel, they had authority to conduct a reasonable safety and document inspection. Particularly in light of the confused state of the *Southern Belle's* registration papers, the officers were justified in entering the enclosed portion of the vessel to examine the main beam number, as well as to conduct a safety inspection of the engine room. While below, Lieutenant Howard observed burlap bags partially concealed with clothing and blankets. Ensign Watson also saw these bags from the deck of the vessel. While conferring on the deck about their suspicions that these bags might contain marijuana, Howard noticed the odor of marijuana. We have no difficulty concluding on the basis of these facts that the officers had probable cause to search the contents of the bags for contraband which was in the process of being imported into the United States. *See United States v. Odneal,* 565 F.2d 598, 600 (9th Cir. 1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978); *cf. Coolidge v. New Hampshire,* 403 U.S. 443, 465–68, 91 S.Ct. 2022, 2037–2039, 29 L.Ed.2d 564 (1971) (plain view). Discovery of the marijuana, together with the other facts known to the officers, amply justified arrest of the defendants and seizure of their vessel. 14 U.S.C. § 89(a).

Defendants' other two arguments are insubstantial. We agree with the district court that these defendants have no "standing" to contest the search of the briefcase, the camera, and the film canisters seized aboard the *Southern Belle* since none of the defendants, either at the time of the seizure or at the suppression hearing, asserted any proprietary or possessory interest in the items seized. *See Rakas v. Illinois,* 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978). We thus do not consider whether the opening of the briefcase, the camera, and the film canisters was, as the government contends, justified under the exigent circumstances doctrine. *Compare United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Finally, as we find no basis for holding any of the seized material inadmissible, defendants' contention that absent such material there was insufficient evidence to support a conviction fails. The district court did not err in denying defendants' motions for judgment of acquittal.

*Affirmed.*