**UNITED STATES of America**

v.

**Adalberto BARRIO, et al.**

**Cr. No. 82–117 GG.**

United States District Court,
D. Puerto Rico.

Dec. 3, 1982.

---

Raymond L. Acosta, U.S. Atty., Hato Rey, P.R., for plaintiff.

Nicolás Nogueras, Jr., San Juan, P.R., for defendants.

MEMORANDUM OPINION

GIERBOLINI, District Judge.

I

The Grand Jury returned a True Bill against the eight defendants charging in one count that "[o]n or about June 17, 1982, on the high seas and on board a vessel subject to the jurisdiction of the United States, the 'SANTA FE', ADALBERTO BARRIO, PABLO ALONZO, ERNESTO PARALES, REYES CARTALES, OCTALAVARO GUERRA, ANGEL CARRASCO, JOSE DEL CARMEN CARTALES AND BELARMINO PEREZ, the defendants herein, aiding and abetting each other did unlawfully, knowingly and intentionally possess with intent to distribute approximately 36,000 pounds of marijuana, a Schedule I, Controlled Substance. The District of Puerto Rico was the point of entry where said defendants entered the United States following the commission of the aforesaid offense. All in violation of Title 18, United States Code, Sections 2, 7, 3238 and Title 21, U.S.C., Section 955a(a)".

The motion for suppression of evidence filed by the defendants was referred to the magistrate for report and recommendation. An evidentiary hearing was held and the magistrate has filed his report recommending that the motion be denied. The defendants filed an opposition and we ordered the transcript of the proceedings had before the magistrate. We have studied the transcript and examined the documentary evidence submitted.

The facts are not really in controversy; but each party, as usual, draws different legal conclusions from the same. As shown in the transcript of the evidentiary hearing, they can be summarized as follows:

On June 16, 1982 approximately at 4:30 p.m., the United States Coast Guard Cutter Point Warde which was in the vicinity of Dog Island,[1] on the eastern side of St. Agatha Pass, received information from the

---

1. Located at 250 miles from Puerto Rico.

Coast Guard Operations Center in San Juan to the effect that a Coast Guard aircraft which was on a routine patrol flight had spotted a vessel approximately 100 miles from the Cutter. It was stated that the vessel had no visible indications of nationality or homeport; was white in color; approximately 60 feet in length; with a blue trim on the hull; red letters Sta. Fe on either side of the bow and on the transom. It appeared as a shrimper type vessel.

With this information, the Point Warde set a course to identify the vessel and investigate its activities. Lt. Junior Grade Christopher Abel was the Commanding Officer of the Coast Guard Cutter.

The SANTA FE was actually intercepted approximately at 10:00 p.m. on the evening of June 16, 1982. The description of the vessel was identical to that already received by the Point Warde and it was noted that the vessel had its fishing gear removed and seemed to be riding low in the water which indicated that it was carrying a heavy cargo. It was not flying any flag.

From thereon, a substantial number of attempts were made by the Point Warde to contact the SANTA FE's crew both in English and Spanish, through radio, using the international distress frequency. These attempts had negative results. Then, the Point Warde moved twenty-five yards from the SANTA FE and used its loud hailer in further attempts to call the SANTA FE's crew's attention. All to no avail. In addition, the Point Warde sounded its loud horn. No response was obtained. Nobody could be observed on deck or in the pilot house of the SANTA FE. This, of course, is very unusual for a vessel at sea. At this point, some of the crewmembers of the Coast Guard Cutter indicated that while downwind they could perceive a distinct odor of marijuana coming from the SANTA FE.

For some time, the Point Warde ran with the SANTA FE and at 11:00 p.m. the SANTA FE went dead in the water. Some crewmembers appeared on deck. It was

the first time that the vessel's crewmen came out on deck. Voice communication was established. Answering an inquiry, the crewmembers indicated that the SANTA FE was of Venezuelan registration and that the vessel's homeport was Punta Hijo in Venezuela. They stated that the captain was not on board. The SANTA FE started to move again and communications were broken. At that point, the Point Warde contacted the El Paso Intelligence Center (EPIC)[2] and sometime thereafter received information that the SANTA FE and its crew were suspected of being involved in smuggling bulk narcotics such as marijuana and hashish. The information was also to the effect that the SANTA FE had been recently in Colombia.

The Commander of the Point Warde, Lt. Abel then contacted the San Juan Operations Center, advised of the situation and requested permission to board the SANTA FE. It was around midnight. The San Juan Operations Center informed Lt. Abel to be ready for a long delay because diplomatic clearance was needed and diplomatic offices in Washington were closed at that time.

At 1:00 a.m. June 17, 1982, the vessel went again dead in the water and voice communication was reestablished. The SANTA FE never answered communication through radio as attempted by the Point Warde both in English and Spanish. At this time, one of the crewmember after repeating the claim of the SANTA FE's registration and last port of call, stated that the vessel was en route to Antigua and was carrying no cargo; he also informed that they were experiencing fuel filter problems which was the reason why the vessel was stopping periodically. Assistance was offered and permission to board the vessel to check the registration papers was requested. But both were denied. Upon request, a Venezuelan flag was produced but when asked about the number of the Venezuelan registration, the answer was in the nega-

**2.** EPIC is a computerized information center of the United States Enforcement Administration which regularly supplies law enforcement agencies the information about vessels suspected of engaging in smuggling. *U.S. v. Streifel,* 665 F.2d 414 (2nd Cir.1981)

tive. The crewmembers indicated that the registration number was unknown. At this time, the course of the SANTA FE was towards the Island of Saint Bartolome rather than towards Antigua which is north and west. At this time, some crewmembers of the Point Warde again could smell marijuana while at downwind.

Around noon June 17, 1982, Lt. Abel was advised by the Operations Center that Venezuela had refuted the SANTA FE's claim to Venezuelan registration, he was authorized to board the SANTA FE as a stateless vessel for law enforcement purposes. The SANTA FE was running but again went dead in the water and a boarding party from the Cutter was sent to board it. The crewmembers were gathered on the aft portion of the deck and for security reasons, the Commander of the boarding party ordered a sweep for additional personnel which might be on board. At this time, again the odor of marijuana was present. Large bales were observed in the main hold. Some wrapped in brown burlap and others in black plastic bags. These bales obstructed the way down below. A brown and greenish, leafy substance was showing from the corner of one broken bale. The contents of this bale were tested and proved positive for THC which is an active ingredient of marijuana. The SANTA FE was seized and its crew was placed under arrest and thereafter the vessel, its crew and the marijuana cargo were brought to San Juan, Puerto Rico.

## II

The defendants request us to reject the report and recommendation submitted by the magistrate based primarily on three grounds. First, they claim that their Fourth Amendment rights were violated when the Coast Guard conducted the search of the SANTA FE and the seizure of the cargo without a warrant. Second, it is alleged that the search and seizure were illegal because the SANTA FE was a Venezuelan vessel, not a stateless vessel as claimed by the United States. Third, it is asserted that no evidence was produced tending to show that the controlled substance found in the SANTA FE was intended for distribution in the United States.

We will briefly discuss each of these allegations:

■ Defendants stumble over the first hurdle in their way to obtain the suppression of evidence on Fourth Amendment grounds. They have no standing. We have examined very carefully the evidence presented at the evidentiary hearing and all the allegations advanced by defendants. Nowhere can we find an assertion to the effect that defendants have any proprietary or possessory interest in the vessel or the cargo. All of them were mere crewmembers and, as such, they lack standing to request the suppression of evidence on Fourth Amendment grounds. *United States v. Hilton,* 619 F.2d 127, 133 (1st Cir.1980); *United States v. Williams,* 617 F.2d 1063 (5th Cir.1980).

■ It is well established that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). More recently, the Supreme Court has ruled that a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search and seizure of a third person's premises or property, has not had any of his Fourth Amendment rights infringed. *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969), cited with approval in the seminal case of *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ For a long time the Court has recognized that ships are not the same as houses. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Moreover, in *United States v. Ross,* —— U.S. ——, 102 S.Ct. 2157, 72 L.Ed.2d 572, the Court again went over the same theme and noted that "historically warrantless searches of vessels . . . as opposed to fixed premises such as a

house or other building had been considered reasonable by Congress". It is only unreasonable searches that are proscribed.. But in the present case we find that the factual situation is more than enough to support the reasonable suspicion standard applicable to judge searches under 14 U.S.C. 89(a). It must be pointed out that no warrant was required under the exigent circumstances of this case which deals with the search of a vessel on the high seas where undoubtedly the Coast Guard had reasonable and articulable grounds for suspecting that the SANTA FE was engaged in criminal activities. *United States v. Green,* 671 F.2d 46 (1st Cir.1982); *United States v. Williams, supra.* If further authority is needed to support this doctrine, it could be found in *Hilton, supra,* at page 131: "The oceans are the highways of the world. Vessels off our coasts may be from anywhere on any mission. They may easily lose themselves on the trackless waters". Although in *Hilton* the Court was dealing with an American flag vessel, the same result should follow in the case of stateless and assimilated vessels on the high seas under the circumstances of this case pursuant to 14 U.S.C. 89(a).[3] This section which has been held constitutional, *United States v. One (1) 43 Foot Sailing Vessel,* 538 F.2d 694 (5th Cir.1976), is the proper statutory authority to search a foreign or stateless vessel on the high seas.

Considering the above, the request for suppression of evidence under the Fourth Amendment must fail.

## III

We turn now to defendants' contentions that the SANTA FE was not a stateless vessel but rather a Venezuelan vessel on the high seas and that consequently, we lack jurisdiction to try them under 21 U.S.Code 955a(a).

Section 955a reads as follows:

"(a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

\*    \*    \*    \*    \*    \*

"(h) This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States."

Thus, right at the outset, we must state that the fact that the SANTA FE was boarded while on the high seas is not determinative since Congress specifically intended the effects of Section 955a to extend to acts and places outside its territorial jurisdiction. The acute problem posed by the importation into the United States of enormous amounts of narcotics and the protective principle of jurisdiction, Cf. *United States v. Angola,* 514 F.Supp. 933 (S.D.Fla. 1981), require and empower Congress to take the necessary measures to protect the nation within the frame of the Constitution and international obligations. See *United*

---

**3.** Section 89(a) reads as follows:

"(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears

that a breach of the laws of the United States rendering a person liable to arrest is being, or has been, committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized."

*States v. Cadena,* 585 F.2d 1252 (5th Cir. 1978).

 Was the SANTA FE a stateless vessel as claimed by the United States or was it a vessel of Venezuelan registration as claimed by the defendants? Let us go back to the facts of this case.

When approached by the Point Warde, the SANTA FE was not flying a flag or showing any other visible sign of nationality or homeport. When voice communication was established between the two vessels (all attempts to establish radio communication proved fruitless) a crewman stated that the master was not aboard, that the vessel was of Venezuelan registration and that the registration number was unknown. The proper Venezuelan authorities were officially contacted and they disclaimed and refuted the SANTA FE's assertion of Venezuelan nationality. This repudiation by Venezuela clearly rendered the SANTA FE stateless. A stateless vessel is a vessel without nationality and, as such, an international pariah. This type of vessel has no internationally recognized right to navigate freely on the high seas. *United States v. Monroy,* 614 F.2d 61, 64 (5th Cir.1980), cert. den. 449 U.S. 892, 101 S.Ct. 250, 66 L.Ed.2d 117 (1980) and was consequently subject to the jurisdiction of the United States or any other nation. See *United States v. Cortes,* 588 F.2d 106 (5th Cir.1979); 14 U.S.C. 89(a); Z.G. Hackworth, *Digest of International Law* 725 (1942).

We hold with the above in mind that after the repudiation by Venezuela of the nationality claimed by the SANTA FE, the SANTA FE was a stateless vessel and the Point Warde had the right, indeed the obligation, to board the vessel to verify its nationality and investigate its activities.

### IV

Once we have reached the conclusion that the SANTA FE was a stateless vessel, defendants' third argument concerning the lack of evidence to show that the controlled substance found in the SANTA FE was intended for distribution in the United States, cannot stand. There is no need for proof of a nexus between the stateless vessel and the country seeking to effectuate jurisdiction. Jurisdiction exists solely as a consequence of the vessel's status as stateless pursuant to Section 955a. *United States v. Marino García,* 679 F.2d 1373 (11th Cir.1982).

WHEREFORE, in view of the foregoing, the Motion to Suppress is hereby DENIED.

SO ORDERED