2009 ME 87

**STATE of Maine**

v.

**Brent L. McKEEN.**

Supreme Judicial Court of Maine.

Argued: Jan. 13, 2009.
Decided: Aug. 11, 2009.

Neale T. Adams, Dist. Atty., Todd R. Collins, Asst. Dist. Atty. (orally), Caribou, ME, for the State of Maine.

Alan F. Harding, Esq. (orally), Hardings Law Office, Presque Isle, ME, for Brent McKeen.

Zachary L. Heiden, Esq., Maine Civil Liberties Union Foundation, Portland, ME, for amicus curiae Maine Civil Liberties Union Foundation.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, and LEVY, JJ.

Dissent: SILVER, MEAD, and GORMAN, JJ.

CLIFFORD J.

[¶ 1] The State of Maine appeals from the order of the Superior Court (Aroostook County, *Hunter, J.*) granting Brent L. McKeen's motion to suppress all of the evidence in the operating under the influence case brought against him. Because we agree with the State that the Superior Court erred when it determined that 12 M.R.S. § 10353(2)(G) (2008)[1] violates the Fourth Amendment by authorizing game wardens to stop any all-terrain vehicle (ATV) and granted McKeen's motion to suppress, we vacate the judgment.

## I.  BACKGROUND

[¶ 2] Game Warden Joshua Smith testified as follows at the hearing on McKeen's motion to suppress. At approximately midnight on August 12, 2007, Warden Smith and a Maine State Trooper

1. Title 12 M.R.S. § 10353(2)(G) (2008) has recently been amended to require wardens to have a "reasonable and articulable suspicion to believe that a violation of law has taken place or is taking place" prior to stopping an ATV. P.L. 2009, ch. 389, § 1 (effective Sept. 12, 2009). The statute was signed into law June 12, 2009, after McKeen's appeal was argued before this Court. The amended version of the statute would have precluded McKeen's stop. The amendment is not retroactive, however, and we therefore rule on the statute allowing stops of ATVs by game wardens without articulable suspicion as it existed at the time of McKeen's stop.

were having a conversation outside of a convenience store located on the corner of Routes 1 and 1A in Mars Hill. Two ATVs approached the intersection of Routes 1 and 1A, and then each proceeded on a different path. Smith proceeded after McKeen and stopped him in order to check his registration and safety equipment.[2] Smith had no specific suspicion of any criminal activity on the part of McKeen prior to the stop.

[¶ 3] Smith approached the ATV and asked McKeen to furnish his certificate of registration. As McKeen searched for his registration, Smith observed that McKeen's movements were slow, his speech was slurred, his eyes were bloodshot, and his breath smelled of alcohol. Smith also noticed a beer can in one of the compartments that McKeen had opened. After McKeen performed field sobriety tests, Smith arrested McKeen and ultimately charged him with operating an ATV while under the influence (Class D), 12 M.R.S. § 10701(1–A)(D)(2) (2008).

[¶ 4] McKeen moved to suppress all of the evidence obtained as a result of the search and seizure. The Superior Court held a hearing, and ultimately granted McKeen's motion to suppress on the grounds that the warden's stop was constitutionally unreasonable and violated McKeen's Fourth Amendment rights. Pursuant to 15 M.R.S. § 2115–A(1), (5) (2008), the State obtained permission from the Attorney General and filed this appeal.

## II. DISCUSSION

[¶ 5] The parties agree that 12 M.R.S. § 10353(2)(G) gives the warden authority to stop McKeen's ATV. They disagree, however, about the constitutionality of the statute. "We review the constitutionality of a statute de novo, beginning with the presumption of the statute's constitutionality." *State v. Malpher*, 2008 ME 32, ¶ 18, 947 A.2d 484, 488. As the person challenging the statute, the burden is on McKeen to establish the statute's infirmity. *See Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 7, 740 A.2d 560, 563.

[¶ 6] Pursuant to 12 M.R.S. § 10353(2)(G), wardens are authorized to:

Stop and examine any all-terrain vehicle to ascertain whether it is being operated in compliance with chapter 939 or any other provision of this Part regulating ATVs, demand and inspect the operator's certificate of registration and, when appropriate, demand and inspect evidence that the operator has satisfactorily completed a training course as required by section 13152.[3]

[¶ 7] The Legislature authorized ATV stops, such as the one that occurred here, based on its finding expressed in the statute that "activities associated with ATVs constitute a more intrusive use of private property open to recreational use by the public than do other recreational activities, and that abusive uses of ATVs puts access to private property for recre-

---

2. The trooper proceeded after the other vehicle. Only the warden's stop of McKeen is the subject of the motion to suppress, and therefore, this appeal.

3. Another section of the statute, 12 M.R.S. § 10353(2)(D) (2008), requires wardens to have "reasonable and articulable suspicion" before stopping "motor vehicles," which by definition include ATVs, *see* 12 M.R.S. § 10001(41) (2008). McKeen argues that

when sections 10353(2)(D) and 10353(2)(G) are read together, section 10353(2)(D) imposes a constitutional standard on section 10353(2)(G). The plain language of section 10353(2)(G), however, does not require "reasonable and articulable suspicion" before stopping an ATV. *See State v. Thongsavanh*, 2007 ME 20, ¶ 27, 915 A.2d 421, 427 (stating that the intent of the Legislature is gleaned from the plain language of the statute).

ational use at risk." 12 M.R.S. § 13156–A (2008). In enacting section 10353(2)(G), the Legislature recognized the importance of assuring that private property in Maine continues to be available for recreational use. Maine's recreation industry, which plays a vital role in the State's economy, depends on the continued willingness of the owners of private property to allow their land to be used for activities such as hunting, fishing, cross-country skiing, and snowmobiling.

[¶ 8] As the Legislature has found, ATV use—or misuse—puts such access to private land at risk. If private landowners lack confidence in the State's efforts to protect their land, they will prohibit the public's access to it. Section 10353(2)(G) is vital to the State's efforts, and thus to the sustainability of our recreation industry, because it allows wardens to stop ATVs with or without reasonable articulable suspicion in order to assure that they are being operated in accordance with the laws of the State.

[¶ 9] McKeen argues that section 10353(2)(G) is unnecessary to ensure compliance with the laws regulating the operation of ATVs. McKeen contends that a warden does not have to actually stop an ATV to confirm that it is properly registered because the "highly-visable, large registration stickers" are sufficient for a warden to ascertain whether the ATV is properly registered.

[¶ 10] Consistent with the legislative finding that ATV use intrudes on private property and puts the recreational use of private property at risk, ATVs are subject to a myriad of regulations, which are currently codified at 12 M.R.S. §§ 13151–13161 (2008). Although in most cases a warden could ascertain, without stopping an ATV, whether the ATV is properly registered, and whether the operator is in compliance with *some* of the safety regula-

tions, not all of the requirements set forth in sections 13151 to 13161 can be checked without an actual stop.

[¶ 11] For example, children as young as nine years old can operate ATVs, but only if they complete a proper training program. 12 M.R.S. § 13152(2). Operation of ATVs by untrained children poses a serious risk to the safety of children as well as a risk of damage to private land, and there is no way to check a child's age and to determine whether the child has completed the requisite training without stopping the ATV. Additionally, an ATV operator must obtain permission from a private landowner before traveling on that person's land. 12 M.R.S. § 13157–A(1–A). In fact, ATV operators are required to stop and identify themselves at the request of the landowner. 12 M.R.S. § 13157–A(2). An ATV operator also needs permission before operating on snowmobile trails. 12 M.R.S. § 13157–A(4); *see also* 12 M.R.S. § 13107 (2008). It is difficult for a warden to verify such permission without stopping the ATV.

[¶ 12] Other safety regulations that would be difficult or impossible to check without actually stopping the ATV include the requirement that operators younger than eighteen years old wear protective headgear, 12 M.R.S. § 13157–A(13), the requirement that ATVs be equipped with certain noise devices and spark arresters, 12 M.R.S. § 13157–A(15), and the prohibition on carrying a snorkel kit or other equipment designed to allow the ATV to be used in deep water without the permission of the landowner, 12 M.R.S. § 13157–A(26). These regulations are directly related to the intrusiveness of ATVs on private property and the safety risks they pose if operated improperly. Section 10353(2)(G) makes it possible for wardens to effectively enforce these regulations. If wardens are stripped of the authority to

stop ATVs without articulable suspicion, the regulations become much less effective.

[¶ 13] Moreover, the difficulty in preventing ATV operators from damaging private property is compounded by the great utility of ATVs. Standard motor vehicles and trucks, whose use is limited—both legally and practically—to roads and highways, are subject to supervision by local, county, and State law enforcement officers. In contrast, ATVs are operated—legally and practically—off road, on land throughout the State, and the regulation of ATVs across a wider expanse of area is primarily left to a limited number of wardens. Provisions allowing wardens to stop watercraft, 12 M.R.S. § 10353(2)(F) (2008), and snowmobiles, 12 M.R.S. § 10353(2)(H) (2008), without articulable suspicion are necessary for this same reason.

■ [¶ 14] The United States Supreme Court has long recognized that there are circumstances in which the Fourth Amendment protections may be limited. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Often, these circumstances involve stops by wardens and others who are charged with promoting safety and protecting natural resources. *See Delaware v. Prouse,* 440 U.S. 648, 664, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (Blackmun, J., concurring) (clarifying that restrictions on motor vehicle stops as set out in *Prouse* do not cast any "constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties").

[¶ 15] We, along with courts in other states, have also recognized the limitations of the Fourth Amendment's reach regarding wardens and other officers whose duties include patrolling and protecting vast territories, such as waterways and wooded areas. *See, e.g., State v. Giles,* 669 A.2d 192, 193 (Me.1996) (noting the "special exigencies of sea travel" in upholding the routine stop of a boat without articulable suspicion); *State v. Sherburne,* 571 A.2d 1181, 1184–85 (Me.1990) (upholding the use of road blocks by game wardens to enforce fishing laws due to the State's substantial interest in protecting natural resources); *see also State v. Layton,* 196 Ill.App.3d 78, 142 Ill.Dec. 539, 552 N.E.2d 1280, 1287 (1990) (stating that "[t]he roving conservation officer patrol stopping hunters, encountered in the field … does not violate the fourth amendment" because hunters are deemed to have consented to some intrusions when they get a hunting license or hunt without one); *State v. Boyer,* 308 Mont. 276, 42 P.3d 771, 775 (2002) (holding that "a game warden may request production of a valid hunting or fishing license when the circumstances reasonably indicate that an individual has been engaged in those activities").

[¶ 16] In the cases cited above, courts have articulated the need to preserve natural resources so that generations to come can enjoy these resources. Section 10353(2)(G) aims to preserve one type of these valuable resources—the thousands of acres of land in Maine owned by private individuals but available for recreational use by the public. Because ATVs are designed, regulated, and primarily used for off-road recreation, and given the State's legitimate and substantial interest in its natural resources and the safety of all involved, operators like McKeen have a limited expectation of privacy, even though some operators may use ATVs as a mode of transportation. The intrusiveness of the stops authorized by section 10353(2)(G) is minimal when compared with the State's legitimate and substantial interests in regulating ATVs. McKeen has not met his burden to demonstrate the statute's uncon-

stitutionality, and his motion to suppress must be denied.

The entry is:

Judgment vacated. Remanded to the Superior Court for entry of an order denying McKeen's motion to suppress, and for further proceedings consistent with this opinion.

SILVER, J., with whom MEAD, and GORMAN, JJ., join, dissenting.

[¶ 17] The Court today infringes on the liberties of Maine citizens by allowing unconstitutional stops of ATVs, which the Legislature itself no longer finds appropriate. The Legislature's recent amendment to 12 M.R.S. § 10353(2)(G) now requires a warden to have a reasonable, articulable suspicion prior to stopping an ATV. P.L. 2009, ch. 389, § 1 (effective Sept. 12, 2009). However, the amendment does not apply retroactively to McKeen's stop. As a result, the Court must address the constitutionality of suspicionless ATV stops. Its holding is a limited one. Nevertheless, it is one that flouts the Fourth Amendment rights of ATV drivers and sends a message to Maine citizens and the Legislature that this Court tolerates regulations that plainly infringe upon individuals' Fourth Amendment liberties.

[¶ 18] The Court's holding is based significantly on private property risks, yet it fails to recognize that McKeen was stopped at the intersection of an established ATV trail and a public highway. Furthermore, I believe any safety concerns associated with ATVs may be addressed in a far less intrusive manner than by allowing wardens to stop ATV drivers without any suspicion that a violation of the law is taking place. For these and the following reasons, I dissent.

[¶ 19] To determine the constitutionality of section 10353(2)(G), the State's interests must be balanced with the intrusiveness of its conduct. *See State v. Ullring*, 1999 ME 183, ¶ 21, 741 A.2d 1065, 1071; *State v. Roche*, 681 A.2d 472, 475 (Me. 1996). The Fourth Amendment requires searches and seizures to be reasonable. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Edmond*, 531 U.S. at 37, 121 S.Ct. 447; *see Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Although suspicion is not an indispensable component of reasonableness, the United States Supreme Court has "recognized only limited circumstances in which the usual rule does not apply." *Edmond*, 531 U.S. at 37, 121 S.Ct. 447. For example, the Court has permitted searches where highly regulated industries are involved and when necessary for administrative purposes. *See, e.g., New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (upholding a warrantless search of a junkyard where stolen vehicles were found); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (holding that, once in a building to stop a fire, firefighters did not need a warrant to remain in the building for a reasonable amount of time after extinguishing the fire to investigate how it started).

[¶ 20] The Supreme Court has also upheld suspicionless searches in circumstances where there are special needs beyond general law enforcement. *Edmond*, 531 U.S. at 37, 121 S.Ct. 447. Specifically, the Court has permitted highway checkpoints constructed for the purposes of combating drunk driving and intercepting illegal immigrants. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In addition, the Court has suggested that a roadblock for the purpose of verifying licenses and

registration would not violate the Fourth Amendment. *See Prouse,* 440 U.S. at 663, 99 S.Ct. 1391 (majority opinion). In such instances, all vehicles experience the state's police power, and each driver can see that all other vehicles on the road are being stopped. *Id.* at 657, 99 S.Ct. 1391. Such brief stops as those described "do not involve the unconstrained exercise of discretion." *Id.* at 663, 99 S.Ct. 1391. Otherwise, unless there is

> at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Id.* Pursuant to section 10353(2)(G), however, wardens may stop ATVs without any suspicion at all, and they have unbridled discretion to stop certain ATVs and disregard others.

[¶ 21] The majority reasons that *Prouse* and other Supreme Court case law do not apply here because drivers of ATVs do not merit the same Fourth Amendment protection as drivers of automobiles. Likewise, the State argues that while the Supreme Court recognizes an automobile to be "a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities," *Prouse,* 440 U.S. at 662, 99 S.Ct. 1391, ATVs are in a separate and distinct category. The State likens an ATV to a toy and contends that an individual choosing to operate that toy has limited liberty interests when compared to the legitimate and compelling State interests associated with ATVs.

[¶ 22] To substantiate its purported compelling interests, the State relies on legislative findings, which state that "activities associated with ATVs constitute a more intrusive use of private property open to recreational use by the public than do other recreational activities, and that abusive uses of ATVs puts access to private property for recreational use at risk." 12 M.R.S. § 13156–A. The State also contends that ATVs are dangerous toys that need to be regulated for safety reasons, and it points to legislative findings that ATV use poses a risk to private property.

[¶ 23] I address the alleged safety concerns and private property risks respectively. First, the Legislature's findings, as explicitly stated in section 13156–A, relate only to private property risks, not safety concerns. In fact, the Maine Department of Conservation and the Maine Department of Inland Fisheries and Wildlife had reported to the Legislature, just prior to the statute's enactment, a significant decrease in the number of ATV accidents in Maine (from 239 in 1985 to 120 in 1987), and the two departments asserted that "[e]xisting statutes seem[ed] generally adequate to address issues related to safety. . . ." Me. Dep't of Conservation & Me. Dep't of Inland Fisheries & Wildlife, Report and Recommendations on Maine's All–Terrain Vehicles (Jan. 1989). There was no legislative debate concerning the statute, nor any other reports present in the legislative record. Furthermore, as I discuss below, the safety concerns associated with ATVs can be addressed in a less intrusive manner.

[¶ 24] Second, with respect to the Legislature's concerns regarding private property, the State does not elaborate on how spot-checking the registration papers of random ATV drivers would serve to alleviate the alleged risks that the use of ATVs poses on private property. The State's argument is even less persuasive in a case such as this one, where the spot-checking

took place at the intersection of an established ATV trail and a public highway.

[¶ 25] In addition, it is reasonable to assume that many individuals use ATVs just as they would automobiles: as their "mode of transportation to and from [their] home ... and leisure activities," *see Prouse,* 440 U.S. at 662, 99 S.Ct. 1391, bringing about the same expectation of privacy as one would have in an automobile. An individual does not relinquish his expectation of privacy or his constitutional rights simply because he is behind the wheel of an ATV rather than a car or truck. There must be a state interest that sufficiently justifies the intrusion.

[¶ 26] The majority points to case law in Montana and Illinois upholding the constitutionality of stops made solely for the purpose of verifying fishing and hunting licenses, and it contends that such stops are justified to protect our natural resources. Indeed, Maine has a statute aimed at "protect[ing] fish and wildlife." Title 12 M.R.S. § 10353(2)(E) (2008) permits a warden to stop a person engaged in hunting, fishing, or trapping, in order to check the person's license, permit, or equipment. However, section 10353(2)(E) specifically prohibits such stops if the person is in a motor vehicle, unless the stop is part of a roadblock or checkpoint. If the Legislature had intended section 10353(2)(G) to permit stops of ATVs for the purpose of protecting fish and wildlife, it certainly would not have excluded motor vehicle stops from section 10353(2)(E).

[¶ 27] The Court compares ATVs to boats, pointing to *Giles,* 669 A.2d at 193, in which this Court upheld the suspicionless stop by the Coast Guard of a boat in Boothbay Harbor due in part to the "special exigencies of sea travel." Similarly, the State contends that section 10353(2)(G) is no different than a federal law upheld by the United States Court of Appeals for the

First Circuit in *United States v. Hilton,* 619 F.2d 127 (1st Cir.1980). The federal statute at issue in *Hilton* allows the Coast Guard to board any vessel at any time to examine its papers and documents, and to search the vessel and ask questions of those on board. 619 F.2d at 130–31. I disagree with the analogy of ATVs to boats.

[¶ 28] The government interests underlying the suspicionless stops of boats on the ocean differ from those at issue here. The government has a significant interest in being able to identify vessels off its coasts in part because unregistered or unsafe ships could constitute international hazards. *Id.* at 131–32. In addition, central to the First Circuit's holding in *Hilton* are "the unique circumstances existing on the high seas, the long history of regulatory stops and inspections of ocean-going vessels, the heavy overlay of maritime and international law, [and] the concern of the nation for policing its ocean borders," among other things. *Id.* at 132. In *Giles,* we distinguished vehicles on our nation's roads from vessels that have access to the open ocean. 669 A.2d at 193. We noted the "special exigencies of sea travel" and the "historical fact that seagoing vessels have always been subject to boarding by government officials." *Id.* In a case upholding a similar federal statute, *United States v. Villamonte–Marquez,* 462 U.S. 579, 593, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), which we relied on in *Giles,* the United States Supreme Court recognized yet another unique government interest with respect to the high seas: the need to deter and apprehend smugglers.

[¶ 29] The First Circuit recognized in *Hilton* that automobile stops differ from vessel stops also because there are limited alternatives available to the government when securing the high seas. 619 F.2d at 133. Certainly, a roadblock, which would

be constitutionally permissible for checking the license and registration of automobile drivers, would not be feasible on the ocean, where vessels do not travel on established routes. In contrast, section 10353(2)(G) permitted a warden to stop McKeen at the intersection of an established ATV trail and a public highway. The stop was on an established route, rather than in the "vast territor[y]" that the majority is concerned with patrolling and protecting. Furthermore, the circumstances enumerated in *Hilton* that apply to vessels do not necessarily apply to ATVs. In particular, the international concerns associated with vessels on the high seas do not apply to the operation of ATVs. The traveling capabilities and the capacity of ocean-going vessels to present risks at our maritime borders are far greater than those presented by ATVs close to the Canadian border.

[¶ 30] In upholding the federal statute in *Villamonte–Marquez,* the Supreme Court further distinguished vessels on the high seas from automobile stops, specifically noting that

> [t]he system of prescribed outward markings used by States for vehicle registration is also significantly different from the system of external markings on vessels, and the extent and type of documentation required by federal law is a good deal more variable and more complex than are the state vehicle registration laws.

462 U.S. at 593, 103 S.Ct. 2573. ATVs in Maine are required to display two highly-visible, large registration stickers on the front and back of the ATV pursuant to 12 M.R.S. § 13155(3), (9). We have stated that the sticker requirement suggests "a warden can visually check an ATV's registration status without actually stopping the vehicle." *State v. Cilley,* 1998 ME 34, ¶ 3 n. 4, 707 A.2d 79, 81. Here, the warden testified that the registration stickers were placed, as they should be, on the front and back of McKeen's ATV. If the intent of section 10353(2)(G)—as the State contends—is to ensure compliance with registration and safety laws, it seems that the warden needed only to obtain McKeen's registration number from the front or back of his ATV. Consequently, the warden could check his records or make any phone calls necessary to confirm that the registration is current.

[¶ 31] Furthermore, the majority concedes that, in most cases, the safety-related requirements of 12 M.R.S. §§ 13151–13161 can be verified without stopping an ATV. For example, wardens need not stop ATVs to confirm that their headlights and taillights are working properly or that they are in compliance with noise-related regulations. The majority reasons that wardens should be permitted to infringe on the Fourth Amendment rights of adult ATV drivers merely because the Legislature has permitted children to ride ATVs, resulting in a need to confirm that the younger drivers have completed proper training programs. *See* 12 M.R.S. § 13152(2). However, if the Legislature feels that it is safe for a ten-year-old to drive an ATV, there are far less intrusive methods for regulating that use than those methods that impinge on the rights of all adult ATV drivers. Moreover, none of the child safety concerns enumerated by the Court, such as helmet and training requirements for children, apply to this case. It was certainly possible for the warden to distinguish fifty-three-year-old McKeen from a child driver without actually stopping his ATV. Unlike children, adult ATV drivers do not need a license to operate an ATV, nor are they required to complete any training. 12 M.R.S. § 13152(1), (2).

[¶ 32] If the vast majority of the State's ATV-related safety concerns may

be addressed without stopping an ATV, the intrusiveness of section 10353(2)(G) far outweighs the State's interests. *See Ullring,* 1999 ME 183, ¶ 21, 741 A.2d at 1071; *Roche,* 681 A.2d at 475. Therefore, given that the purpose of section 10353(2)(G) is to check registration and verify compliance with safety laws, and given that registration is required to be—and was in this case—displayed on the front and back of the ATV, I believe the statute authorizes searches and seizures far beyond those necessary to achieve the legislative purpose.

[¶ 33] Although I recognize that there are differences between ATVs and automobiles, I do not find them to be so vastly dissimilar as to preclude the application of *Prouse.* In *Prouse,* the United States Supreme Court recognized that states "have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." 440 U.S. at 658, 99 S.Ct. 1391. However, spot checks—in which vehicles are stopped only so that their vehicle registration may be verified—amount to intrusions upon Fourth Amendment interests that I believe are not justified by the state interests they serve. *See id.* at 659, 99 S.Ct. 1391. Particularly here, where the same goal can be achieved by a warden obtaining an ATV's registration number from stickers on the front and back of the vehicle, I would hold that section 10353(2)(G) authorizes searches that are unreasonable under the Fourth Amendment.